583 A.2d 852

CITY OF SCRANTON, Petitioner,

v.

WORKMEN'S COMPENSATION APPEAL BOARD
(HART), Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs March 16, 1990.

Decided Dec. 5, 1990.

Reargument Denied Jan. 18, 1991.

484

Gregory D. Geiss, Honesdale, for petitioner.

Edwin A. Abrahamsen, with him, Harry T. Coleman, Abrahamsen, Moran, Connolly & Conaboy, P.C., Scranton, for respondent Hart.

Before CRUMLISH, Jr., President Judge, PELLEGRINI, J., and SILVESTRI, Senior Judge.

PELLEGRINI, Judge.

City of Scranton (Scranton) files a Petition For Review of an Order of the Workmen's Compensation Appeal Board (Board) affirming a Referee's award of Fatal Claim Benefits to Gertrude Hart, widow (Widow) of James Patrick Hart (Hart) deceased.*

Hart, a Scranton Police Detective, died of a self-inflicted gunshot wound on September 6, 1981. On August 17, 1984, Gertrude Hart filed a Fatal Claim Petition (Petition), alleging that her husband's suicide was a result of a work-related psychiatric injury. The Referee issued a Decision and Order finding that the decedent had not suffered a work-related injury, and that his death was not causally related to his employment.

Claimant Widow appealed to the Board from the Referee's Decision. The Board vacated the Referee's findings and conclusions and remanded the case for the Referee to apply the correct legal standard of proof in suicide cases in the then recently enunciated decision by our Supreme Court in *Globe Security Systems Company v. Workmen's Compensation Appeal Board (Guerrero)*, 518 Pa. 544, 544 A.2d 953 (1988).

After taking additional testimony, the Referee found that decedent suffered a work-related psychiatric injury which caused his suicide, and awarded Fatal Claim Benefits. The Board affirmed the Referee's Decision and the City of

* This case was reassigned to the authoring Judge on July 19, 1990.

Scranton filed the instant Petition for Review.[1]

There is no dispute as to whether Hart suffered from a psychiatric problem at the time of his death. The Referee made a specific finding of fact and conclusion of law that Hart suffered from depression.[2] The finding and conclusion were based on the testimony presented at the hearing, especially that of James P. Lesniak, M.D. Dr. Lesniak testified that in his judgment "Mr. James Hart did suffer from a major depressive episode with mood congruent psychotic features." (R.R. 231a). Furthermore, Anthony G. Turchetti, M.D., Scranton's expert medical witness, also testified that Hart was "probably depressed and probably had a major depression." (R.R. 155a–156a).

Scranton contends, however, that the Referee and Board erred in granting benefits because there is insufficient evidence of record to establish that Hart suffered a psychic injury as a result of exposure to "abnormal working conditions." Scranton argues that Hart's working conditions, although stressful, were not abnormal, as required to justify compensation as provided in *Martin v. Ketchum, Inc.,* 523 Pa. 509, 568 A.2d 159 (1990).

The Claimant Widow contends that there is sufficient evidence to support the Referee's conclusion that there was

1. Our scope of review is limited to determination of whether constitutional rights have been violated, errors of law have been committed or necessary findings of fact were unsupported by substantial evidence. *Mathies Coal Company v. Workmen's Compensation Appeal Board (Henry),* 114 Pa.Commonwealth Ct. 11, 538 A.2d 590 (1988).

2. The Referee's Finding of Fact # 10 states in relevant part:
 After complete review of all of the testimony and evidence in the record, this Referee finds that decedent suffered from depression which was causally related to the stress and pressures of his work, and this depression was so severe that it overrode rational judgement and decedent committed the act of suicide on September 6, 1981.
 The Referee's Conclusion of Law # 2 states:
 There was legal, competent, substantial and credible evidence in the record that decedent suffered from depression which was brought about by his work-related duties, and that this depression was so severe that it overrode decedent's rational judgement and decedent committed suicide on September 6, 1981.
 Referee's Decision, December 29, 1988. (R.R. 17a–20a).

"abnormal working conditions." She argues that the evidence shows Hart came under extreme pressure to solve numerous murders committed by a serial killer stalking the Scranton area, as well as numerous unrelated murders and suspicious deaths which occurred during this time period. She contends that this highly publicized and unusual rash of murders, combined with Hart's already stressful and increasing duties as the detective in charge of physical evidence, pushed him over the edge, resulting in his psychiatric injury and subsequent suicide.

Under Section 301(a) of The Pennsylvania Workmen's Compensation Act (Act), Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 431, self-inflicted death is compensable, provided it is a direct result of a work-related psychiatric illness. *Globe Security Systems, Co.* The psychiatric injury itself must have resulted from the claimant's objective reaction to "abnormal working conditions." *Martin v. Ketchum, Inc.* Thus, in order for the Claimant Widow to recover benefits, she must establish that her husband experienced "abnormal working conditions" and those "abnormal working conditions" resulted in a psychiatric illness which was so severe that it overrode his rational judgment and led to his suicide.

The Pennsylvania Supreme Court, in *Martin v. Ketchum Inc.*, recently adopted the "abnormal working condition" standard as the test to determine whether a work incident was the source of a psychiatric injury. The Supreme Court stated that:

> The phraseology "abnormal working conditions" has been employed by the Commonwealth Court in this case and in prior decisions of that court to *distinguish between objective and subjective evidence of the working conditions alleged to have caused the injury,* i.e., the mental illness or mental illness ending in suicide. Review of that line of cases by the Commonwealth Court demonstrates that the phraseology describes the *requirement that the claimant produce evidence establishing that the mental ill-*

*ness is, in fact, a work-related injury. The requirement is an objective one, rather than a subjective one.*

. . . . .

The Commonwealth Court's approach was intended to *distinguish psychiatric injuries that are compensable because the necessary causal relationship between the employment and mental disability has been established* from those psychiatric injuries that arise from the employee's subjective reactions to normal working conditions. *The phraseology "abnormal working conditions" has developed into a shorthand expression for that critical distinction.*

*Martin,* 523 Pa. at 515, 568 A.2d at 164. (Emphasis added.)

■ Scranton contends that Claimant Widow has not established "abnormal working conditions" pursuant to *Martin* since high stress is a normal working condition for a police officer. Scranton further contends that Claimant Widow has failed to "pinpoint" an "abnormal working event," and that an increase in duties of the same type is insufficient to meet the *Martin* standard. From an examination of the decision culminating in the *Martin* doctrine, "abnormal working conditions" does not mean only pointing to a single incident but can result from a combination of events, when taken together, make the work performance unusually stressful for that type of job.

The *Martin* decision's adoption of the "abnormal working condition" standard was derived from the rationale developed by this court in a line of cases beginning with *Thomas v. Workmen's Compensation Appeal Board (Atlantic Refining Co.),* 55 Pa.Commonwealth Ct. 449, 423 A.2d 784 (1980). In *Thomas,* we stated that "[d]ue to the highly subjective nature of psychiatric injuries, the occurrence of the injury and its cause must be adequately pinpointed." *Thomas,* 55 Pa.Commonwealth Ct. at 455, 423 A.2d at 787; *See also Bevilacqua v. Workmen's Compensation Appeal Board (J. Bevilacqua Sons),* 82 Pa. Commonwealth Ct. 511, 515, 475 A.2d 959, 961 (1984).

This standard was further explained in *Hirschberg v. Workmen's Compensation Appeal Board (Department of Transportation)*, 81 Pa.Commonwealth Ct. 579, 474 A.2d 82 (1984), in which this court stated that "a claimant must establish that his mental condition was aggravated or precipitated by actual, and not merely perceived or imagined, employment events." *Hirschberg*, 81 Pa.Commonwealth Ct. at 583, 474 A.2d at 85. The employee must prove that his injury did not arise from his "subjective reaction to normal working conditions." *Leo v. Workmen's Compensation Appeal Board (Borough of Charleroi)*, 114 Pa.Commonwealth Ct. 6, 11, 537 A.2d 399, 402 (1988); *See also Kane v. Workmen's Compensation Appeal Board (Williamsport Automotive)*, 107 Pa.Commonwealth Ct. 360, 528 A.2d 302 (1986).

The first use of the term "abnormal working conditions" in *Martin*, to describe the test for compensability of stress as a work-related injury, came in a concurring and dissenting opinion of Judge Doyle in *Bell Telephone Company of Pennsylvania v. Workmen's Compensation Appeal Board (DeMay)*, 87 Pa.Commonwealth Ct. 558, 487 A.2d 1053 (1985). Judge Doyle delineated a test he would require the Referee to apply to psychic injuries. In criticizing the majority in the companion case for awarding benefits as a result of normal stress in an employment situation, Judge Doyle wrote:

> By holding that a high stress work environment is, and of itself, a sufficient work-related abnormality, the majority creates a dangerous precedent. Many types of jobs are, by their very nature, high stress. Such occupations as that of an air traffic controller, a school teacher in a ghetto area, or *a police officer,* for example, may well be viewed as high stress; but for these particular positions, *high stress is normal* ... This court has already recognized the highly subjective nature of psychological injuries; *Bevilacqua*, 82 Pa.Commonwealth Ct. 511, 475 A.2d at 961; *Hirschberg v. Workmen's Compensation Appeal Board (Department of Transportation)*, 81 Pa.Common-

wealth Ct. 579, 583, 474 A.2d 82, 84 (1984); *Thomas,* 55 Pa.Commonwealth Ct. at 459, 423 A.2d at 789. We have, therefore, required that in such claims, the injuries' occurrences and causes be clearly delineated. This reasoning is sound and in my view should be adopted to require specificity in the Referee's findings with respect to what makes a high stress work environment an *abnormal working condition.*

It is my view that for a high stress working environment to constitute a legally sufficient *abnormal working condition, there must be a finding either that claimant's work performance (as distinguished from the mere job description) was unusually stressful for that kind of a job* or a finding that an unusual event occurred making the job more stressful than it had been.

*Bell Telephone,* 87 Pa.Commonwealth Ct. at 569–70, 487 A.2d at 1058–59. (Emphasis added.)

██ We do not believe then, that the *Martin* doctrine meant to preclude the awarding of benefits where there is clear and convincing evidence that already stressful normal working duties were not only increased, but were accompanied by an increase in the intensity of stress associated with such duties. In such a case, a clear causal connection exists between the increased and abnormal stress of the job and the mental illness as envisioned by *Martin.* In order for Hart's Widow to receive benefits, the Referee must find by objective evidence that Hart's working conditions were "abnormal," either due to an unusual stressful event or the fact that the increase in his work responsibilities became unusually stressful for the kind of job he performed.

██ There was sufficient credible evidence presented before the Referee to support a conclusion that Hart experienced "abnormal working conditions." [3] Hart, a member of

3. The question of whether Hart experienced "abnormal working conditions" is a mixed question of law and fact fully reviewable by this Court. The "abnormal working conditions" test is simply a deduction from other facts and is purely the result of legal reasoning. Thus, we may judge its correctness and draw our own conclusions on appellate

the Scranton Police Department since 1946, was promoted to rank of detective in 1964. Hart headed the Criminal Identification Division and was assisted by two other officers. (R.R. 73a, 104a). As head of the Criminal Identification Division, Hart was responsible for testifying at preliminary hearings, trials and grand jury investigations. (R.R. 84a). Hart was also in charge of the Mobile Crime Lab, a unit which he would take to crime scenes for use in developing physical evidence. (R.R. 76a, 104–105a).

There were many important jobs involving the development of physical evidence that only Hart was specialized in performing. He had the sole responsibility for taking photographs of crime scenes and other physical evidence, and was constantly called upon because he was the only officer trained in police photography at the Department. (R.R. 58a, 76a, 105a–106a). Hart was also the only man qualified to photograph autopsies, and was called upon to photograph between 50 and 100 of them. (R.R. 106a–108a).

Hart was also the Department's polygraph examiner, since he was the only officer qualified to do this procedure. (R.R. 83a–84a). Hart's other duties included gathering all fingerprints, photographing crime scenes, collecting all physical evidence, and logging and processing all types of evidence, including photographs and mug shots. (R.R. 34a, 58a). Although the Department had two men in charge of the evidence room, most of the responsibility was on Hart. (R.R. 75a).

Not only did Hart shoulder heavy responsibilities, he also was required to do all of his own paperwork, since the Department had no civilian person such as clerks or secretaries. (R.R. 73a–74a, 76a, 109a). It is quite clear that the work performance required of Hart was extremely difficult and stressful, but for his position, this type of stress was normal.

Although Hart managed to handle his difficult and stressful job responsibilities with the Department, a terrifying

review. *Stambaugh v. Stambaugh,* 458 Pa. 147, 329 A.2d 483 (1974); *In Dorrance's Estate,* 309 Pa. 151, 163 A. 303 (1932).

turn of events dramatically increased his duties and compounded the intensity of the stress. About three years before his death, a man named Nicholas Karabin began a serial killing spree in the West Scranton area, the area in which Hart and his family resided.

Frank Roche, Captain of Detectives in the Department's Detective Bureau and Hart's supervisor, stated that the period between 1979 and 1981 was "significant in our memory because we were deluged with a tremendous amount of major crime, not including the routine, burglaries and rapes and so forth; we had been hit with a serial murderer, Nicholas Karabin, who had a common scheme where he was going to kill a great number of people in the West Scranton Area." (R.R. 77a).

Captain Roche further testified that "[w]e had not been experiencing the amount of murders that we experienced in that period of time, and we were all under a heavy work load, but I think that Detective Hart probably carried more of a burden during this period because of his duties." (R.R. 86a). Roche stated that Hart's work load during this period was "much heavier, very much more heavier" than in the past. (R.R. 86a). He also stated that the role of Criminal Identification Detective is "one of the most important roles in criminal investigation." (R.R. 75a). Captain Roche described Hart as "very, very dedicated to his job." (R.R. 93a).

Hart, as the head of the Criminal Identification Division, bore full responsibility for the identification of suspects and the development of physical evidence for all crimes committed in the Scranton area. In contrast, the Pennsylvania State Police have a policy of having at least two men in Hart's position investigate every crime. (R.R. 127a–129a).

Beginning with the Karabin serial killings, Hart's responsibilities and the pressure on him increased dramatically. Hart was the main officer responsible for collecting and securing the evidence in the murders committed by Karabin. (R.R. 81a, 85a). Karabin was known to have killed at least three Scranton area citizens, James Shipmann, Gerald

Walsh and Charles Doolittle, and all these cases received enormous publicity. One of the men Karabin had killed was a neighbor and family friend of Hart's. (R.R. 36a, 59a). The family would constantly call Hart at home asking if there had been a break in the case. (R.R. 36a). Hart, thus, felt tremendous pressure from the victim's family and members of the community to solve these crimes.

Also during this time period, several other homicides were committed which were unrelated to the Karabin murders, but received unusual publicity because of the presence of the serial killer in the community. There was the killing of Margaret Davis, a young woman from Hart's neighborhood who had gone to school with one of his daughters. (R.R. 43a, 60a, 87a, 89a). There was also the murders of Hodgkins, Munley, and Brigga. (R.R. 36a, 43a, 60a–61a, 87a–89a).

Hart was given additional responsibilities as a result of these major crimes. Hart was required to testify before grand juries which were convened to solve these murders. (R.R. 84a). He was also required to travel out of town to testify at the murder trials of Karabin and James Martin, a co-defendant, who were tried separately in different counties due to a change of venue because of the publicity. (R.R. 39a, 82a). The Karabin trial in Harrisburg took over two and one-half weeks. (R.R. 39a, 82a). Hart had repeatedly told his wife that he hated to be away from home, but had to go. (R.R. 39a–40a, 46a).

Hart also began exhibiting strange and unusual behavior after he came under the extreme pressures of the serial murders. Hart began to drink heavily, starting right after work and continuing all day on the weekends. (R.R. 36a–38a, 63a). He also started to wear an ankle holster and gun around his leg at all times of the day, starting eight months before his death. This, from a man who actually hated guns and who had locked his service revolver in a drawer each day for the previous thirty-four years. (R.R. 38a, 64a–65a). His wife asked him several times about the ankle

holster, but all she got was "you don't know the pressure, you don't know the pressure." (R.R. 38a). Another peculiar behavior which began shortly before his death was the fact that he began to constantly carry his police radio with him. He took it to bed and left it on all night. (R.R. 42a, 64a).

Then came the murder of Tom Genova, a local school director, whom Hart had known personally. (R.R. 61a). Mr. Genova was shot while in his car on the way to attend a school board meeting. The murderer used a "sabot" bullet which was virtually untraceable. (R.R. 87a). The only evidence the Department had to go on was a footprint left in the snow which Hart had photographed. The photo revealed a print left by a western style boot, which the Department believed matched the type worn by a suspect in the case. (R.R. 88a–89a). Hart spent a great deal of time with the Investigative Grand Jury presenting the evidence he had uncovered. (R.R. 88a).

It was Hart's responsibility to match the footprint with the boots owned by the suspect. Hart took the photograph down to the FBI laboratory in Washington, D.C. on Thursday, September 3, 1981, for analysis by photo enhancement. (R.R. 89a). This trip out of town alone and away from his family was unusual and extremely upset Hart. (R.R. 39–40a, 46a, 65a–66a). When he was picked up at the bus station by his son Patrick, he threw his hands up in the air and told his son that he wouldn't believe the pressure on this one. He also started rambling on about something Patrick couldn't understand. (R.R. 66a). Once at home, when asked by his wife how it went, Hart stated "Oh, you'll never know." (R.R. 46a). The next day, after a long drinking binge, Hart committed suicide.

It is clear from the evidence adduced during the hearings before the Referee that Hart did, in fact, experience "abnormal working conditions." Although a detective's job is normally quite stressful because of the incidents related, Hart's job responsibilities became unusually stressful for the type of work he was assigned to perform.

When Scranton faced the epidemic of murders, the stressful responsibilities increased drastically. Hart was given new responsibilities, such as traveling out of town for trials and to have scientific tests performed on crucial physical evidence. He also was required to present evidence to grand juries. Even with all the added responsibilities due to the serial killings, Hart was required to perform his regular duties with respect to all of the other crimes commonly committed in Scranton.

Not only did Hart's responsibilities increase, but the intensity of stress associated with his duties also increased. Hart felt tremendous pressure from the community to solve these crimes, and arrest the murderers. This pressure was compounded by the fact that some of the victims were prominent citizens. Moreover, since Hart personally knew three of the murder victims and was especially close to one of the families, the intensity of the pressure on him to solve these crimes was overwhelming. His trips to out-of-town trials and to analyze evidence were also extremely stressful, since he had so much work to be done back at the Department and he hated to be away from his family. (R.R. 39a–40a, 93a–94a, 115a–116a).

The circumstances in the present case in which an increase in Hart's responsibilities was compounded by an increase in the intensity level of the stress associated with his responsibilities, clearly support the Referee's finding that "abnormal working conditions" exist due to the fact that his work performance became unusually stressful.

 We must now review the Referee's finding that Hart's psychiatric illness was so severe that it caused a deranged mental condition which, in turn, caused his suicide. The Referee employed the "chain-of-causation" test adopted by our Supreme Court in *Globe Security Systems Co. v. Workmen's Compensation Appeal Board (Guerrero)*.

The elements which must necessarily be proven in order to recover compensation for suicide under the "chain-of-causation" test are as follows:

1) that there was initially a work-related injury as defined by Section 301 of the Act; (2) which injury directly caused the employee to become dominated by a disturbance of the mind of such severity as to override normal rational judgment; and (3) which disturbance resulted in the employee's suicide.

*Globe Security Systems Co. v. Workmen's Compensation Appeal Board (Guerrero),* 518 Pa. at 552, 544 A.2d at 957; *McCoy v. Workmen's Compensation Appeal Board (McCoy Catering Service, Inc.),* 102 Pa.Commonwealth Ct. 436, 440, 518 A.2d 883, 884–885 (1986).

The first element has been satisfied by our conclusion that Hart suffered a psychiatric injury as a result of "abnormal working conditions," and as such, he suffered a work-related injury under Section 301 of the Act. *See Martin v. Ketchum, Inc.*

The second element is satisfied by the Referee's finding that Hart's depression "was so severe that it overrode rational judgment." *See* Footnote # 2. There is substantial evidence of record to support this conclusion. Hart's life was dominated by the stress of his position. During the last few months of his life, he exhibited unusual behavior, drank alcohol excessively and was constantly unnerved by the pressure of his job and the offerings of help from his family and co-workers. His major depression and feelings of inadequacy on the job overrode any rational judgment on his part.

The third and final element is satisfied in that Hart's major depression resulted in his suicide on September 6, 1981. This causal connection was clearly established by the testimony of the medical experts. (R.R. 154a–157a, 199a–200a, 202a–203a). Therefore, we conclude that the Referee was correct in finding that Hart's suicide was a direct result of a psychiatric illness which overrode his rational judgment.

Accordingly, we will affirm the Board's Order affirming the Referee's Decision granting the Claimant Widow's Fatal Claim Petition.

## ORDER

AND NOW, this 5th day of December, 1990, the Order of the Workmen's Compensation Appeal Board dated August 9, 1989, is affirmed.

SILVESTRI, Senior Judge, dissenting.

Scranton contends that the referee and Board erred in granting benefits because there is insufficient evidence of record to establish that Hart suffered a psychic injury as a result of exposure to "abnormal working conditions." Because I agree with this contention, I must respectfully dissent from the majority's award of the benefits and conclusion that the "circumstances in the present case ... clearly support the Referee's finding that 'abnormal working conditions' exist due to the fact that his work performance became unusually stressful."

The majority indicates "[i]t is quite clear that the work performance required of Hart was extremely difficult and stressful, but for his position, this type of stress was normal." (Majority opinion, p. 9.) I wholeheartedly agree that the stress Hart was under was normal for a person in the position of a detective responsible for numerous police investigations. However, the majority then gives an overly detailed description of what Hart did, full of picturesque but subjective phrases, self-serving statements made by Hart's family, and equivocal, vague testimony given by the Captain of Detectives and Hart's supervisor upon which they base their decision to affirm the award of benefits. The majority's lengthy recitation evinces no evidence to support the critical determination that the stress Hart was allegedly under was abnormal for a person in his position.

Moreover, the majority does not distinguish between profit-employers and a public-employer, such as a municipality,

who hires law enforcement officers to preserve the peace and order of the community. The matters which such law enforcement officers confront in the performance of their law enforcement duties are not dependent upon conditions created by the municipality, but upon the extent and nature of the conduct of those members of the public who engage in violations of the law, from simple assault to pre-meditated murder. Criminal conduct by members of the public is unpredictable and without prior notice as to the manner, nature, time, place and victim of such conduct, either to the municipality or to the law enforcement officers.

The normal working environment of a law enforcement officer employed by a municipality is derived from and dependent upon the kind of law violations by the public. Normal working conditions for one employed in law enforcement involve the totality of the responsibilities undertaken by Hart; i.e., investigation, identification, apprehension, indictment, trial and conviction of persons engaging in criminal conduct. Even acknowledging that Hart's position was stressful, none of the facts of this case, such as the attempt to apprehend a serial killer, responsibility for photographs of crime scenes, polygraph examinations, criminal investigation, indicate working conditions that are abnormal for someone in the position of Hart.[1]

This Court has already established that a claimant's subjective reaction to normal working conditions is not a compensable injury under The Pennsylvania Workmen's Compensation Act. *Thomas v. Workmen's Compensation Appeal Board*, 55 Pa.Commonwealth Ct. 449, 456, 423 A.2d 784, 788 (1980). As Judge Doyle stated in *Bell Telephone Company of Pennsylvania v. Workmen's Compensation Appeal Board (DeMay)*, 87 Pa.Commonwealth Ct. 558, 487 A.2d 1053 (1985):

1. Significantly, Frank Roche, the Captain of Detectives and Hart's supervisor, in testifying, offered no evidence that either he or any other member of the Department's Detective Bureau suffered adversely from the work being performed by the Department personnel; neither was any such evidence adduced from any other source.

By holding that a high stress work environment is, in and of itself, a sufficient work related abnormality, the majority creates a dangerous precedent. Many types of jobs are, by their very nature, high stress. Such occupations as ... a police officer, for example, may well be viewed as high stress; but for these particular positions *high stress is normal.*

The majority's benevolent award of benefits to a person in the circumstances of Hart will have far-reaching effects upon workmen's compensation liability of public employers whose duties are, inter alia, to apprehend and prosecute criminals and on such employer's ability to defend such claims. Accordingly, I would reverse the award of benefits to Hart, whose delineation of duties by the majority, while an excellent "job description" for a law enforcement officer in the Scranton Police Department's Detective Bureau, does not constitute "abnormal working conditions.".