612 A.2d 638

**LUKENS STEEL COMPANY, Petitioner,**

**v.**

**WORKMEN'S COMPENSATION APPEAL BOARD (Tommy D. PRICE), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Jan. 31, 1992.

Decided July 8, 1992.

178

Terry W. Knox, for petitioner.

Charles S. Katz, Jr., for respondent.

Before DOYLE and FRIEDMAN, JJ., and BARRY, Senior Judge.

FRIEDMAN, Judge.

Lukens Steel Corporation (Lukens) appeals from two orders of the Workmen's Compensation Appeal Board (WCAB), the first order reversing the referee's decision and remanding for additional findings of fact,[1] and the second order affirming the referee's award of benefits to claimant, Tommy D. Price (Price), based on a work-related psychiatric disability under Section 301(c) of The Pennsylvania Workmen's Compensation Act, Act of June 2, 1915. P.L. 736, *as amended,* 77 P.S. § 411.[2] We reverse.

Price had been employed by Lukens as a crane operator since 1973 when, in the Fall of 1980, he experienced an anxiety attack while driving his car. Thinking that he was having either a stroke or a heart attack, Price went to see his family physician, who referred him to a heart specialist. Price was off work for several days while he underwent tests to determine the source of his problem; however, the tests proved negative. Following this initial incident, Price suffered additional episodes of anxiety while working at Lukens and consulted Dr. Vernon, the plant physician, who referred Price to psychiatrist Arthur Schless, M.D., for treatment. Dr. Schless diagnosed Price as suffering from anxiety depression and prescribed anti-anxiety medication. On the advice of Dr. Schless, Price did not work at Lukens from November 6, 1980 through April 25, 1981. Price received non-occupational disability benefits during this period.

Price returned to work on April 26, 1981; however, he was not permitted to resume his job as a crane operator because of the effects of the medication he was taking. Instead, Price worked in the labor pool without loss of earnings until October

1. The WCAB reversed the referee's first decision only because the referee made no findings on whether Lukens received timely notice of Price's disability, a mandatory requirement for the recovery of workmen's compensation benefits, or whether Lukens should be credited for accident and sickness benefits allegedly paid to Price. In all other respects, the WCAB accepted the referee's factual findings.

2. The second order also granted interest on deferred compensation to Price and litigation costs to Price's counsel.

10, 1981, when he was laid off during company cutbacks because he lacked seniority. He has not worked since that time.[3] Price continues to take medication and to receive counselling from Dr. Schless. In addition, beginning in February 1983, Price was examined by another psychiatrist, Harold Byron, M.D., who treated Price on four occasions for phobic anxiety reaction.

On May 5, 1983, Price filed for workmen's compensation benefits, alleging that he had suffered a disabling, work-related psychiatric injury on November 6, 1980. Following several hearings, the referee granted benefits for total disability, concluding that Price had been subjected to abnormally stressful work conditions, particularly the animosity of co-workers, which prevented him from performing his job as a crane operator.[4]

Lukens appealed and, in January 1988, the WCAB reversed and remanded for findings on whether Price gave Lukens proper notice and whether credit should have been given Lukens for accident and sickness payments allegedly paid to Price. After two additional hearings, the referee reaffirmed the allowance of benefits, finding that Price had provided Lukens with timely notice of his work-related injury by advising the plant physician, Dr. Vernon, of his symptoms. The credit issue was resolved in Lukens' favor. The WCAB affirmed the referee's decision and Lukens now appeals to this

3. Price made an unsuccessful attempt to work in April 1984 at a mushroom farm; however, after only four hours on the job, Price suffered an anxiety attack which forced him to leave.

4. The referee made several other determinations which Lukens questioned: the referee refused to admit and consider the depositions of two of Price's foremen at Lukens, Robert Lee and Joseph Lee, deciding that they had been taken without regard to Price's timely objection; the referee disallowed credit for accident and sickness payments which Lukens allegedly had paid to Price; the referee allowed reimbursement of litigation costs despite Lukens' claim that they were not of record; and the referee awarded Price interest on past due compensation although Lukens contended that Price was responsible for any delay. With the exception of the credit issue, which was resolved in Lukens' favor on remand, Lukens continues to challenge these determinations in this appeal.

court.[5]

■ Lukens argues that Price failed to satisfy the burden of proof required to recover workmen's compensation benefits for a purely psychological injury.[6] Although a mental disability arising in the course of employment and related thereto is compensable under the Act, *Hirschberg v. Workmen's Compensation Appeal Board (Department of Transportation)*, 81 Pa.Commonwealth Ct. 579, 474 A.2d 82 (1984), our Supreme Court in *Martin v. Ketchum, Inc.*, 523 Pa. 509, 568 A.2d 159 (1990), established a heightened burden of proof for employees asserting a work-related injury of this sort, requiring claimant to prove by objective evidence that he has suffered a mental injury, and that this injury is other than a subjective reaction to normal working conditions. *Id.* Mental disability caused by work-related stress, resulting from an employee's emotion-

**5.** Where the party with the burden of proof prevailed before the referee, and the WCAB has taken no additional evidence, our review is limited to a determination of whether constitutional rights have been violated, errors of law have been committed or necessary findings of fact were unsupported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *Bell Telephone of Pennsylvania v. Workmen's Compensation Appeal Board (DeMay)*, 87 Pa.Commonwealth Ct. 558, 487 A.2d 1053 (1985).

**6.** We have recognized that disabilities involving mental or psychological elements fall into three discrete categories:
  1. Psychological stimulus causing physical injury, the mental/physical case;
  2. Physical stimulus causing psychic injury, the physical/mental case; and
  3. Psychological stimulus causing psychic injury, the mental/mental case.
*Boeing Vertol Co. v. Workmen's Compensation Appeal Board (Coles)*, 107 Pa.Commonwealth Ct. 388, 528 A.2d 1020 (1987), *appeal denied*, 517 Pa. 619, 538 A.2d 501 (1988).
It is this third and most troublesome category, involving psychological disabilities resulting from work-related stress, which confronts us here. Because of the difficulty of obtaining adequate proof in such cases, we have determined that the degree of proof required is quite high. *Hammerle v. Workmen's Compensation Appeal Board (Department of Agriculture, Bureau of Dog Law Enforcement)*, 88 Pa.Commonwealth Ct. 486, 490 A.2d 494 (1985). "Due to the highly subjective nature of psychiatric injuries, the occurrence of the injury and its cause must be adequately pinpointed." *Thomas v. Workmen's Compensation Appeal Board (Atlantic Refining Co.)*, 55 Pa.Commonwealth Ct. 449, 450, 423 A.2d 784, 787 (1980).

al reaction when exposed to normal working conditions is not compensable under the Act. *City of Wilkes–Barre v. Workmen's Compensation Appeal Board (Swan)*, 130 Pa.Commonwealth Ct. 186, 567 A.2d 771 (1989), *appeal denied,* 527 Pa. 619, 590 A.2d 759, 527 Pa. 620, 590 A.2d 760 (1990); *Thomas.* In short, to recover benefits, a claimant must establish that his mental injury and resulting disability were caused by abnormal working conditions, rather than his own perception of the employment situation.

Here, Price claimed that while employed by Lukens as a crane operator, he suffered a psychiatric injury due to abnormal job pressures. Price testified that his job entailed a great deal of responsibility, which made him fearful of injuring ground workers while operating the crane. Further, Price alleged that he was being harassed by co-employees and supervisors in specific areas of the plant.[7]

There is no question that Price suffered from a mental disorder. Both Dr. Byron and Dr. Schless testified that Price required treatment and medication for his continuing anxiety depression. However, this alone is insufficient to entitle him to benefits under the Act; he must also establish that his condition was caused or aggravated by abnormal working conditions. The finding of abnormal working conditions is a mixed question of law and fact, reviewable by this court. *Marsico v. Workmen's Compensation Appeal Board (Pennsylvania Department of Revenue)*, 138 Pa.Commonwealth Ct. 352, 588 A.2d 984 (1991).

The referee concluded that Price met this burden of proving a compensable psychiatric injury, finding:

7. Price testified that he was replacing veteran crane operators in these areas of the plant and that due to his relative inexperience, he was subjected to abuse by fellow workers on the ground who held him responsible for their inability to meet quotas qualifying them for production bonuses. Price testified that there were "cussing matches" with co-employees who referred to him as a "greenhorn." We note, however, that Price testified that at the time he suffered his first anxiety attack at work, he had already been receiving assignments in this particular area, for 2–3 years. (R.R. 80–81). Moreover, the scheduling foreman testified that Price had to work in these areas infrequently. (R.R. 278–279).

3. During the relevant times that Claimant operated a crane at Lukens Steel there was a lot of responsibility inherent in the job because of the danger to persons working on the ground associated with possible careless operation of the crane. In and before November, 1980, Claimant experienced anxiety as a result of this responsibility and the fear that he would injure someone working on the ground under the crane that he was operating. In and before, 1980, Claimant's stress as a result of his job responsibilities was heightened and aggravated by animosity between himself and co-employees working at ground level. The Claimant experienced "cussing matches" back and forth with people working on the ground resulting from expressions of anger between himself as crane operator and the ground workers. This occurred with certain individuals working in certain areas of the plant where Claimant was forced to operate his crane.

4. When Claimant was working in these areas as a crane operator in the course of his employment with Lukens he was called by co-employees names like "green horn" and he was accused of preventing his co-workers on the ground from attaining quotas necessary for them to qualify for production bonuses. Claimant reacted angrily to such verbal exchanges.

5. In this regard, the Referee accepts the testimony of Malcolm Fischer, a crane operator and crane foreman of [Lukens], who testified on behalf of [Lukens], Mr. Fischer describes animosity between the crane operator and ground employees as abnormal working conditions.[8]

8. Mr. Fischer's testimony is hardly corroborative of Price's description of his work environment. Fischer was one of Price's foremen, and although he testified that animosity between ground personnel and crane operators was not normal, (R.R. 289), he also stated that he was unaware of any disagreements between Price and the ground workers during the time that Price was a crane operator, nor were there complaints about Price from any of the area foremen. (R.R. 280–281). Fischer made it clear that he was the one to whom such incidents would be reported, and although admitting that he was unable to constantly observe all the men, he felt it unlikely that any disagreements of this sort would escape being brought to his attention. (R.R. 292–295). Moreover, as scheduling foreman, Fischer testified that he as-

6. The animosity which existed between Claimant and the workers on the ground at the various areas where Claimant worked as a crane operator on varying shifts produced feelings in Claimant that he did not want to go into work because of all the yelling that he could anticipate. It caused tension and stressed [sic] in the fall of 1980 including, November, 1980. During the fall of 1980, Claimant was working at various locations in the plant replacing the older crane operators on their days off. Consequently he was subjected to the animosity which resulted from being a "green horn" on a regular basis during the fall of 1980, including November, 1980.

. . . .

9. Since the last anxiety attack occurred on a 4:00 p.m. to Midnight shift Claimant reported to the dispensary after 8:00 a.m. the following morning and saw the plant physician, Dr. Vernon. He had a conversation with Dr. Vernon during the first week of November, 1980. He explained his symptoms and how he was feeling and told Dr. Vernon that he was under a lot of stress. He said that the stress came from running a crane and having people on the ground who did not agree with him. He told Dr. Vernon that these people on the ground were causing some of his stress and problems.[9]

. . . .

19. The Referee resolves the conflict in the testimony and accepts the testimony of Claimant, rejecting any testimony to the contrary, that Claimant did have anxiety attacks while operating a crane and that he did have phobic concerns and obsessional thoughts about hurting people while operating the crane. Claimant's work activities precipitated his anxiety attacks, although the first anxiety attack occurred in a non/work environment. Claimant's psychiatric pathology was caused by abnormally stressful working con-

signed Price to unfamiliar plant locations rather infrequently, and that even in those areas, Price would handle the same type of crane and therefore would be comfortable with its operation. (R.R. 278–279).

9. Because Dr. Vernon has died, he cannot corroborate the fact that Price told him that stress at work was at the root of his anxiety.

ditions, particularly angry exchanges and "cussing matches" with co-employees who were expressing considerable animosity toward him as a crane operator. Individuals working on the ground considered Claimant to be a "green horn". These abnormally stressful working conditions occurred frequently during the fall of 1980 and in November, 1980 specifically.

(Referee's Findings of Fact Nos. 3, 4, 5, 6, 9, 19). We must now determine whether there is substantial evidence to support the referee's findings that Price's disability was caused by abnormal work conditions, thereby sustaining his burden of proof.

In psychic injury cases, the record must contain unequivocal medical testimony to establish the causal connection between the injury and employment. *Papa v. Workmen's Compensation Appeal Board (Franklin Mint Corp.)*, 121 Pa.Commonwealth Ct. 10, 549 A.2d 1352 (1988); *Hirschberg; Bevilacqua v. Workmen's Compensation Appeal Board (J. Bevilacqua Sons, Inc.)*, 82 Pa.Commonwealth Ct. 511, 475 A.2d 959 (1984); *Kitchen v. Workmen's Compensation Appeal Board*, 73 Pa.Commonwealth Ct. 289, 458 A.2d 631 (1983). Due to the highly subjective nature of mental injuries, an injury's occurrence and cause must be specifically delineated. This requirement is particularly important where, as here, it is recognized that a claimant has an existing character disorder, making made him excessively vulnerable to stress and predisposing him to psychological difficulties.[10]

10. Although not raised as an alternative argument by Lukens, we note that in *Kane v. Workmen's Compensation Appeal Board (Williamsport Automotive)*, 107 Pa.Commonwealth Ct. 360, 528 A.2d 302 (1987), we stated that pre-existing psychological problems aggravated by abnormal and objective job events need not create a continuing disability where the work situation is not unduly unusual. Arguments with co-workers would fall into this category. In such cases, continued psychiatric disability may no longer be related to the work-related injury, but due to the pre-existing mental problem. Thus, even if we were to conclude that Price's problems at work instigated his anxiety attacks, his mental disability may no longer be work related, but may now reflect his pre-existing character disorder. We might be able to draw this conclusion from Price's inability to stay and perform the mushroom job in 1984. Although Price had not operated a crane since 1980 and had not

Both parties presented medical testimony before the referee regarding whether Price's work conditions were the cause of his mental disability. Lukens presented the deposition testimony of Dr. Schless, Price's treating physician, regarding the cause for Price's mental problems. Based on this evidence, the referee found:

11. The Referee accepts the testimony of Arthur Schless, M.D. to the limited extent that this extent that [sic] this physician testified, and the Referee finds, that he removed Claimant from the work environment at Lukens in the late fall of 1980 because there was a contribution to Claimant's stress from pressures upon the Claimant as a result of his supervisor being "on his shit" during the fall of 1980. Due to Claimant's preexisting disorder he was more vulnerable that [sic] a normal individual to stress including work related stress which the Referee finds to have been a significant contributing factor to his disability beginning in November, 1980.

(Referee's Findings of Fact No. 11).

■ Despite the referee's implication to the contrary, our review of the record discloses that Dr. Schless clearly did not offer unequivocal medical evidence that work-related stress caused Price's mental injury. Dr. Schless testified on direct as follows:

Q While he was giving you the history, did he indicate to you what pressures it was that he was under that were causing him to have the problems?

A Well, the initial thrust of the way he presented was that he had thought he was having a heart attack, and that this was physical, and so that it was necessary to have him look into what was going on, because that wasn't his initial reaction. He didn't come out with this is what's bothering me, you know. It was I have heart problems.

worked at Lukens since 1981, and was still on medication which he admits successfully prevents his anxiety, (R.R. 85, 233), Price nevertheless was unable to work at a mushroom farm for longer than four hours before succumbing to anxiety. Dr. Byron attributed Price's inability to remain at this job to his feelings about being around people; Price could not stand crowds and preferred to be alone. (R.R. 52).

So when I asked him that he said that there were a variety of situations, at work, you know, one of his supervisors was, quote, on his shit, close, quote, that his son was going to have some kind of operation, that was a lot of pressure, and he indicated that there might be some other things going on which he didn't go into.

. . . .

Q   ... [T]ell us precisely what Mr. Price told you concerning those other problems?

A   Okay.  Well, he indicated that he was taking marijuana and that he was taking a fair amount of that and he didn't know how that related to this.

. . . .

Q   Did he tell you anything with regard to his job itself, that is his job as a crane runner, whether or not that had any effect on him, and, again, we're talking about the first time they came to see you, we're talking about December of 1980.

A   No.

. . . .

Q   Did he indicate to you at any time between December of 1980 and 1983 that he was—that people called him a green horn, that people yelled at him or cussed at him at work?

A   No.

Q   Did he tell you that he was mad at the people he worked with?

A   He said he had those feelings about the one foreman. That was it.

. . . .

Q   Doctor, do you have an opinion, based upon a reasonable degree of medical certainty, and based upon your training and your experience in the field of psychiatry, and your course of treatment of Mr. Price as to whether his anxiety and anxiety attacks on or about December of 1980 were or were not related to his job of crane operator?

A   Yes.

Q   And what is that opinion?

A   My opinion is that substantially they were not related to that, that as a trigger, the pressure he had at work could have caused him some anxiety but that I don't feel that was the major reason he was out of work.  So, substantially I feel that it was not related to work.

(R.R. 130–138).

Nor did Dr. Schless indicate on cross-examination that Price's allegedly stressful working environment played a significant factor in aggravating Price's pre-existing character disorder.  Although Dr. Schless acknowledged that Price was more vulnerable to stress from any source, and so recommended that he leave work for an undetermined length of time after his attacks, in order to better "get himself together," Dr. Schless did not consider work-related stress as substantially contributing to Price's psychological condition.  On cross-examination, Dr. Schless testified as follows:

Q   Okay.  All right.  Doctor, that leads me right up to my—the next question which is a word that you used on direct-examination when you were asked about causal relationship.  You said the attacks were not substantially related to his employment.

A   Right.

Q   What do you mean there by substantially as opposed to significant?  Where are you drawing the line?

A   Well, I think in terms of analyzing him the way he presented and then the history I got through that period of time, the work, the way he presented it was not given a significant amount of stress and so that I felt that other factors were more prevalent and so that was my impression.  So, but as you say, would he be more vulnerable to work, I agree with that.  So I'm not denying that that was a current stress on him.  It's just that in the view of all the things he related I didn't give it high priority.

(R.R. 165–166).

Even after considering the particular episodes of harassment described by Price, Dr. Schless did not change his opinion.  The fact that Price had never mentioned these incidents during his 1980–1983 treatments, initially raising

them only in reference to receiving benefits after having filed for workmen's compensation, made Dr. Schless skeptical. As he stated, "To me the fact that I saw him over that period of time and I never heard about it and that in the framework that it was brought up made me feel that these were later recognitions on his part, and I don't know how much they were rationalizations and how much he had really experienced them, because when I saw him they weren't forthcoming at that time." (R.R. 167–168). In fact, Dr. Schless stated that even when he tried to explore work stress with Price, Price belittled those problems, saying that he enjoyed his work, and focusing instead on other things. (R.R. 168). Undeniably then, Dr. Schless's testimony does not provide unequivocal medical evidence that abnormal working conditions caused Price's mental injury.

Dr. Byron testified on behalf of Price, stating that Price found the responsibilities and inherent danger of operating the crane extremely stressful. When asked whether Price's work activities were a significant contributing cause of his psychiatric problems, Dr. Byron testified that "based on the history that Mr. Price gave me, I thought that his employment as a crane operator directly related to the stress that he described. ... [The disabling factor] was his anxiety reaction, his phobic concerns with hurting someone in the course of his duties and the hyperventilation symptoms that I have described." (R.R. 41). Even after continued questioning by Price's counsel, Dr. Byron never indicated that Price had discussed his alleged harassment by co-workers or supervisors at Lukens; in fact, rather than testifying that harassment played any role in Price's mental difficulties, Dr. Byron repeated that the source of Price's physical symptoms was his "obsessional concerns that he was going to do something wrong and as a result of that injure somebody." (R.R. 42).

We concede that Dr. Byron stated unequivocally that Price's work activities directly contributed to his diagnosed pathology. However, this does not alter our determination here because we hold that the stress which Dr. Byron unequivocally accepted as the source of Price's anxiety, does not

reflect abnormal working conditions for a crane operator, but rather is a subjective reaction to Price's normal work environment. The referee appears to acknowledge this by finding that "[d]uring the relevant times that claimant operated a crane at Lukens Steel there was a lot of responsibility *inherent in the job* because of the danger to persons working on the ground associated with possible careless operation of the crane." (Referee Finding of Fact No. 3). (Emphasis added). Everyone who operated a crane at Lukens shared the same responsibility; in fact, there is testimony indicating that Price operated only the smaller cranes, so that the responsibility and possibility of danger was less for him than for other crane operators. (R.R. 268–271).

Our case law recognizes that emotional situations should be viewed in the context of the work involved. *City of Scranton v. Workmen's Compensation Appeal Board (Hart)*, 136 Pa.Commonwealth Ct. 483, 583 A.2d 852 (1990), *appeal denied*, 528 Pa. 625, 597 A.2d 1154 (1991); *Supinski v. Workmen's Compensation Appeal Board (School District of Philadelphia)*, 133 Pa.Commonwealth Ct. 631, 577 A.2d 944 (1990); *City of Wilkes-Barre; Moonblatt v. Workmen's Compensation Appeal Board (City of Philadelphia)*, 85 Pa.Commonwealth Ct. 128, 481 A.2d 374 (1984). "[F]or a high stress working environment to constitute a legally sufficient abnormal working condition, there must be a finding either that claimant's work performance (as distinguished from the mere job description) was unusually stressful *for that kind of job* or a finding that an unusual event occurred making the job more stressful than it had been." *City of Scranton*, 136 Pa.Commonwealth Ct. at 490, 583 A.2d at 856, *quoting Bell Telephone of Pennsylvania v. Workmen's Compensation Appeal Board (DeMay)*, 87 Pa.Commonwealth Ct. 558, 569–70, 487 A.2d 1053, 1058–59 (1985). (Emphasis added). Dr. Byron's testimony would not provide a basis for such a finding.[11]

11. Yet the first WCAB opinion stated that the referee, persuaded by Dr. Byron's testimony, concluded that Price met his burden of proving that abnormal work conditions precipitated his anxiety attacks and disabled him from performing as a crane operator. As ultimate fact finder, the referee was free to accept Dr. Byron's testimony that Price's disability

■   Here, the only work situation that could be viewed as abnormal was Price's alleged harassment by his fellow workers and supervisors. However, Dr. Byron's testimony does not support the contention that Price's disability was triggered by harassment; rather, basing his opinion on the history given him by Price, Dr. Byron referred only to Price's fear of injuring ground workers as the cause of Price's psychiatric problems. Therefore, although it adequately establishes the causal connection between Price's injury and his employment, Dr. Byron's testimony cannot lead us to conclude that Price has sustained his burden of proving that this injury is other than a subjective reaction to normal work conditions.

Accordingly, we reverse the order of the WCAB.[12]

## ORDER

AND NOW, this 8th day of July, 1992, the order of the Workmen's Compensation Appeal Board, dated April 30, 1991, is reversed.

---

was related to his work. However, the WCAB's statement is particularly perplexing in light of the fact that the referee made no finding whatsoever concerning Dr. Byron's testimony. The only finding regarding medical evidence was the limited acceptance of Dr. Schless's testimony, who otherwise stated unequivocally that Price's illness was not work-related.

**12.** Because of our disposition of this issue, we need not address the other issues raised.