606 A.2d 539

Louis SQUILLA, Petitioner,

v.

WORKMEN'S COMPENSATION APPEAL BOARD (MARPLE TOWNSHIP and PMA Insurance Company), Respondents.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Oct. 19, 1990.

Decided Jan. 7, 1992.

Publication Ordered March 26, 1992.

---

24

Leonard V. Tenaglia, for petitioner.

Andrew E. Greenberg, for respondents.

Before PALLADINO and BYER, JJ., and BARBIERI, Senior Judge.

BYER, Judge.

In this mental injury case, Louis J. Squilla appeals from an order of the Workmen's Compensation Appeal Board (WCAB) affirming the dismissal of his claim for benefits. We also affirm.

Squilla had been employed as a patrol officer by the Marple Township Police Department since September 4, 1979. In January 1985, during a routine job transfer, he was reassigned to a platoon with four other patrol officers supervised by Sergeant Gerald R. Renner. Shortly after the reassignment, based on what he considered to be the

platoon's less than satisfactory performance, Sergeant Renner orally reprimanded the officers under his command, urging them to increase their work effort.

On June 6, 1985, Sergeant Renner issued a letter of reprimand to Squilla.[1] The letter followed circulation of the department's monthly productivity report which indicated that during the entire month of May, Squilla had not made a single traffic stop or arrest.

Squilla vigorously denied the accuracy of the productivity report[2] and, therefore, felt the reprimand and its accompanying restrictions were undeserved. Squilla made several attempts to vindicate himself and have the letter of reprimand removed from his personnel file, becoming increasing-

1. The letter of reprimand reads as follows:

    Departmental records show, that after *serveral [sic] warnings,* your productivity for the month of May, 1985, in vehicle stops and traffic violation citations is zero (0) in both categories. This is *subpar to the average productivity* of the majority of patrolmen in this department.

    Therefore, from this date, until further notice, you are relieved of any dispatching duties.

    Your lunch or dinner periods are to be no more than forty five (45) minutes. You are also entitled to one ten (10) minute break during each eight tour of duty. Your lunch breaks will be at 1230 Hrs., 1830 Hrs., and 0500 Hrs. during the corresponding shifts, if you are not busy. This can be changed by shift cammander [sic] if necessary. Your ten minute break will be granted, upon request, by the shift cammander [sic].

    You will sign in and out, by radio, to the dispatcher, every time you get in and out of your police unit. This time will be logged by the dispatcher on the radio log.

    Your duties are to continue to answer all radio messages and to complete all assignments. When you are not busy with assignments you will stay on patrol and perform all trained police duties.

2. Squilla testified that he produced one traffic citation and fifteen parking tickets during the month of May which were unacknowledged in Sergeant Renner's written reprimand. (50a–51a). In addition, Frederick Johnson, a fellow officer who testified on Squilla's behalf, indicated that the reprimand misstated the productivity report (131a–135a) and, in fact, the statistical report actually had shown that Squilla made one arrest during the month. (137a). Johnson explained this low figure by noting that Squilla had extensive desk duty during that period, during which he would have been unable to issue tickets. (134a). An officer's time spent working the desk apparently was not reflected in the productivity reports. (194a–195a, 202a).

ly resentful as each new effort failed.[3] His obsession with what he perceived as humiliating and unjustified discipline resulted in social withdrawal, deterioration of family life, loss of sleep, lack of concern about personal appearance and hygiene, and a marked disinterest in his work. Finally, on July 21, 1986, Squilla was placed on mandatory sick leave and has not worked for the department since.[4] Squilla subsequently filed for workmen's compensation benefits.

The referee concluded that Squilla established that he suffered from work-related psychological disorders, but

3. Squilla began his extraordinary attempts at vindication immediately after receiving the written reprimand. Within hours of receiving the letter, Squilla met with the next person in the chain of command, Patrol Commander Lieutenant Francis Dunn. Dunn responded that it was no big deal and Squilla should not worry or take the reprimand personally. (15a–16a). Several days later, Squilla went to speak to the Chief of Police, Daniel Hennessey. Chief Hennessey did not investigate the matter, but determined that because Sergeant Renner had acted within the parameters of his authority in issuing the reprimand, it would be upheld. (16a–17a). Squilla asked Chief Hennessey for a second meeting to present statistical proof that the reprimand was undeserved. This meeting apparently ended in a shouting match.

In September, 1985, Lieutenant Dunn issued a report to the Patrol Sergeants which compiled the 1985 statistics from January through July. The report included a cover letter stating that the statistics were to be used only as a means of improving officer productivity and not as a disciplinary tool. (21a). The officers in the department jokingly referred to this as the "Squilla report." The report and cover letter so aggravated Squilla that he lost control and kicked Sergeant Renner's desk (25a), after which he was suspended for 10 days without pay. Squilla appealed the suspension to the township's Civil Service Commission, hoping to vindicate himself by explaining the events leading up to the incident. However, he was not given this opportunity; instead, the commission sustained his suspension. (28a–29a). Finally, the Public Safety Committee granted Squilla an unprecedented hearing, allowing him the opportunity to tell his story, but offering him no satisfaction.

Throughout this process, Squilla returned to Chief Hennessey's office monthly, armed with the most current productivity statistics with which to argue his case and attempt to clear his record. (31a). Squilla even wrote the Township commissioners asking for a review of his case, but received no reply. (33a).

4. Although no longer able to work as a patrol officer for the police department, Squilla has worked elsewhere. He is currently chief instructor at the Delaware Valley Karate Association, a school owned by his wife, Debra. He also works weekends as a musician.

that he failed to offer evidence sufficient to prove that his disability was caused by exposure to abnormal working conditions. Because the department disciplined Squilla in the same manner as it disciplined other officers, the referee determined that Squilla had not been subjected to abnormal working conditions and denied the claim as non-compensable under section 301(c) of The Workmen's Compensation Act,[5] 77 P.S. § 411. Squilla appealed and the board affirmed.

The question in this case is whether Squilla established that his mental problems were caused by exposure to abnormal working conditions rather than by his subjective reaction to normal working conditions. *See Martin v. Ketchum, Inc.,* 523 Pa. 509, 568 A.2d 159 (1990); *Waldo v. Workmen's Compensation Appeal Board (Erie Metropolitan Transit Authority),* 136 Pa.Commonwealth Ct. 264, 582 A.2d 1147 (1990).

The determination of whether, under the particular facts of the case, a claimant was subjected to abnormal working conditions is a mixed question of law and fact. *Driscoll v. Workmen's Compensation Appeal Board (City of Pittsburgh),* 134 Pa.Commonwealth Ct. 206, 578 A.2d 596 (1990). The referee made the following pertinent findings and conclusions:

4. Claimant became increasingly aggravated by this discpline [sic] and was placed on mandatory sick leave by his employer on July 24, 1986.

8. Claimant testified that on June 6, 1985 he recieved [sic] a written reprimand from his sergeant for alleged failure to write enough traffic and parking tickets. Claimant further testified to increased supervision and pressure from his employer which led to his psychological condition.

9. Dr. Kadish opined that Claimant suffered adjustment reaction with work inhibition with possible psychotic reaction to stress. Dr. Kadish found Claimant's disorder was

5. Act of June 2, 1915, P.L. 736, *as amended.*

caused by his perception of mistreatment by his sergeant and the June 5, 1986 reprimand.

13. Sergeant Renner testified that Claimant was issued a written memo on June 5, 1986 because his productivity in traffic citations was low.

16. The Referee also finds that sergeant Renner and Lt. Dunn to [sic] credible and convincing that the discipline procedures used against Claimant were handled as they normally are with other officers.

(Referee's findings of fact, 4, 8, 9, 13, 16.)

3. Claimant has not established by sufficient evidence that abnormal working conditions existed at the time of his injury.

4. Claimant has not met the burden of proof required to establish a psychological claim against the Defendant.

(Referee's conclusions of law, 3, 4.)

The police department operated under rules and regulations which were familiar to all departmental employees and to which all members were subject. Chapter IV of the regulations concern discipline and provide in pertinent part:

405.00 *Who is subject to Disciplinary Action.* Any member or employee ... who is incompetent to perform his duties, is subject to appropriate disciplinary action.

410.00 *Penalties.* The following penalties may be assessed against any member or employee of the Department as disciplinary action:

Oral reprimand

Written reprimand

Voluntary surrender of time off, in lieu of other action

Suspension

Demotion

Removal from the service

415.00 *Departmental Authority to Discipline.* ... Supervisory personnel may take the following disciplinary measures:

Oral reprimand

Written reprimand (subject to the approval of the Superintendent of Police)

Emergency suspension

Written recommendations for other penalties (586a).

The department's application of these disciplinary rules, although resulting in upset to Squilla's psychological balance, did not constitute abnormal working conditions. The referee accepted Sergeant Renner's testimony that Squilla was not the only officer to whom he ever issued a written reprimand. (194a). As Squilla's immediate supervisor, Renner determined that Squilla's performance of his duties, illustrated by consistently low productivity, was unsatisfactory and indicated a lack of effort that merited this type of reprimand. There also was evidence that other patrol officers received oral or written reprimands when they did not perform adequately. Therefore, the WCAB and referee did not err in determining that Squilla's mental injury was caused by Squilla's subjective reaction to the reprimand rather than by abnormal working conditions.

Our decision is supported by our case law. In *Driscoll,* as here, the claimant contended that his mental injury resulted from the policies of his employer and the employer's treatment of him. After working for the city for 26 years, 10 of which were spent in a management capacity, a seniority roster listed his position at number 72 out of 80, with a resulting loss of privileges, despite his having many more years of service than anyone else listed. The referee, affirmed by the WCAB, concluded that although claimant adequately identified actual employment events which precipitated his mental problems, and the events reflected a significant change in job status, they did not constitute abnormal working conditions. We affirmed, emphasizing that an unjust demotion or unfair treatment are not compensable under The Workmen's Compensation Act.

Similarly, in *Pate v. Workmen's Compensation Appeal Board (Boeing Vertol Co.),* 104 Pa.Commonwealth Ct. 481, 522 A.2d 166 (1987), *appeal denied,* 517 Pa. 611, 536 A.2d

1335, *cert. denied,* 484 U.S. 1064, 108 S.Ct. 1025, 98 L.Ed.2d 989 (1988), an employee claimed that her supervisor's repeated rejection of her work and criticism of her job performance exacerbated a pre-existing schizophrenic condition. We held that these events were not abnormal work conditions, because the evidence did not "support a conclusion that it was abnormal or unusual for [the claimants] supervisors to reject work which did not meet its standards. Criticism for improper work is not *per se* abnormal when an employee has a consistently poor work performance." *Id.* 104 Pa.Cmwlth. at 485, 522 A.2d at 168.

In *Sibrava v. Workmen's Compensation Appeal Board (Trans World Airlines),* 113 Pa.Commonwealth Ct. 286, 537 A.2d 75 (1988), we expressed our concern that although the act is remedial in nature and is to be interpreted liberally in favor of injured workers, we could not embark on the dangerous course of granting benefits to any employee whose personality was in conflict with that of his supervisor or who could not withstand accepted forms of job discipline. "[T]o countenance the distribution of workmen's compensation benefits to all potential claimants who may succumb emotionally to the demands and circumstances of their otherwise normal employment would be to usher in a wide spectrum of compensability heretofore unenvisioned by the General Assembly." *Id.,* 113 Pa.Commonwealth Ct. at 290, 537 A.2d at 77.

■ Squilla also argues that the referee erred in his analysis of the abnormal working conditions issue because the referee considered the issue solely in the context of the conditions to which claimant and his co-workers were exposed to as police officers for this township.

He contends that the abnormal working conditions test requires uniform standards regardless of the claimant's occupation, and that police officers should not be held to a higher tolerance standard than claimants in other occupations. We do not believe this argument, even if correct, would change the result in this case. However, the argument is not consistent with precedent. Our case law recognizes that emotional situations should be viewed in the

context of the work involved.[6] "[F]or a high stress working environment to constitute a legally sufficient abnormal working condition, there must be a finding either that claimant's work performance (as distinguished from the mere job description) was unusually stressful *for that kind of job* or a finding that an unusual event occurred making the job more stressful than it had been." *City of Scranton v. Workmen's Compensation Appeal Board (Hart)*, 136 Pa.Commonwealth Ct. 483, 490, 583 A.2d 852, 856 (1990), *quoting Bell Telephone of Pennsylvania v. Workmen's Compensation Appeal Board (DeMay)*, 87 Pa.Commonwealth Ct. 558, 569–70, 487 A.2d 1053, 1058–59 (1985) (emphasis added).

We awarded benefits in *City of Scranton.* However, because the claimant was a police officer, recognized as high stress employment, we looked for evidence that his working conditions were "abnormal" for the kind of job he performed before granting compensation. We can do no less here. It is essential to the smooth operation and proper administration of an organization like a police department that a high degree of regimentation be maintained. Viewed in this context, strict discipline and respect for rank are normal working conditions.

Finally, Squilla argues that abnormal working conditions existed in light of the provisions of Act 1981–114, 71 P.S. § 2001,[7] which prohibits a municipal employer from order-

---

6. *Moonblatt v. Workmen's Compensation Appeal Board (City of Philadelphia)*, 85 Pa.Commonwealth Ct. 128, 481 A.2d 374 (1984) (attorney); *City of Wilkes–Barre v. Workmen's Compensation Appeal Board (Swan)*, 130 Pa.Commonwealth Ct. 186, 567 A.2d 771 (1989) (police officer); *Supinski v. Workmen's Compensation Appeal Board (School District of Philadelphia)*, 133 Pa.Commonwealth Ct. 631, 577 A.2d 944 (1990) (special education teacher).

7. This Act provides:
   No political subdivision or agency of the Commonwealth shall have the power or authority to order, mandate, require or in any other manner, directly or indirectly, suggest to any police officer, state police officer, game commission officer, fish commission officer or any other officer employed by such political subdivision or agency of the commonwealth that said police officer, state police officer, game commission officer, fish commission officer or any

ing or otherwise requiring a police officer to issue a certain number of citations in any given period. However, the record reveals no evidence that Squilla ever was ordered to write any specific number of tickets within the month, nor that his mental disability resulted from being forced to violate the statute.[8]

We affirm.

## ORDER

We affirm the order of the Workmen's Compensation Appeal Board.

This decision was reached and opinion adopted before the conclusion of Judge Byer's service.

other officer shall issue a certain number of traffic citations, tickets or any other type of citation on any daily, weekly, monthly, quarterly or yearly basis.

8. We do not have before us the question of whether the department acted properly in disciplining Squilla or other police officers for failing to write "enough tickets." Therefore, we express no opinion on that question.