639 A.2d 944

**Harry G. CLOWES, Petitioner,**

v.

**WORKMEN'S COMPENSATION APPEAL BOARD (CITY OF PITTSBURGH), Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 15, 1993.

Decided March 21, 1994.

584

E.M. Viakley, for petitioner.

Irvin S. Bails, for respondent.

Before CRAIG, President Judge, and DOYLE, COLLINS, SMITH and FRIEDMAN, JJ.

FRIEDMAN, Judge.

Harry G. Clowes (Clowes) petitions for review of an order of the Workmen's Compensation Appeal Board (Board) which affirmed a referee's[1] decision to deny him total disability benefits for an alleged psychic injury.

At the time of his alleged injury, Clowes was employed by the City of Pittsburgh (City) as a detective in the homicide division of the City's police department. In April of 1989, Clowes was hospitalized as a psychiatric patient, and, thereafter, he filed a petition for benefits claiming that he suffered from a work-related psychic injury. Specifically, he stated that he suffered from post-traumatic stress disorder and severe depression precipitated by "unusual working conditions" and "unusual employment events." Hearings were held before the referee who made the following relevant findings of fact:[2]

4. On November 30, 1989 ... Claimant testified as follows:

a. Claimant was a police officer with the City of Pittsburgh for twenty-three and one-half years....

b. During Claimant's first eleven years as a police officer, he was a plainclothes officer assigned to various precincts throughout the City of Pittsburgh. In this capacity, Claimant was in charge of arresting and investigating various offenses such as prostitution, gambling, narcotics, and massage parlors.

c. Claimant was then transferred to the Detective Bureau ... and assigned to the vice squad.

1. Referees are now called Worker's Compensation Judges under the new amendments to the Worker's Compensation Act effective August 31, 1993. Because this case was before the Referee prior to the effective date of the amendments, however, we will refer to the Referee as such and not as Worker's Compensation Judge.

2. We must note that "findings of fact" which merely recite the testimony given by a witness, without more, are of no value when we are performing meaningful appellate review. When a factfinder specifically states that a witness is credible, we must assume that *all of the testimony of that witness is accepted as true.* Findings of fact are best made by the use of declarative sentences in which the factfinder simply states what he or she finds the facts to be.

d. In 1981, Claimant was transferred and reassigned to the night felony squad where he was called upon to investigate crimes he previously handled, as well as crimes against persons.

e. In 1985, Claimant was transferred to the homicide division.... Claimant attempted to delay said transfer stating that he was not sure if said assignment was right for him.

f. In the capacity of a homicide officer, Claimant was called upon to investigate homicides and attend autopsies as well as interviewing the families of victims.

g. Very shortly after Claimant's transfer to the homicide division, he sought the care of Dr. Gerald Massaro, psychologist for the City of Pittsburgh Police Department.

h. Claimant again had occasion to treat with Dr. Massaro in April of 1989. At the time Dr. Massaro recommended the psychiatric admission of the Claimant to Butler Memorial Hospital.

i. Claimant is presently under the care of Dr. Chester Berchling (sic) who has been treating the Claimant twice a week since April of 1989.

5. On cross examination, Claimant testified that prior to his transfer to the homicide division, he never witnessed an individual who had been shot or one injured in a motor vehicle accident. This referee finds the testimony of the Claimant credible.

6. Claimant also presented the testimony of City of Pittsburgh detective, Terrance P. O'Leary.... Detective O'Leary testified that Claimant's moods seemed to change over the approximately four years he was Claimant's partner, and that the condition seemed to grow progressively worse.

7. Detective O'Leary testified that ... he has never known a police officer who was the first person to view a deceased with whom the officer had a personal relationship....

. . . .

Detective O'Leary's opinion was that as a result of the change of duties from the Vice Division to the Night Felony—Homicide Division, claimant began to slowly deteriorate mentally in an objectively discernible manner until his total disability in April, 1989. Claimant also presented the testimony of John Casciato, a police officer for thirty years. 8. He has known the claimant for approximately fifteen years (15) and testified as follows:

a. After claimant's transfer to the Night Felony—Homicide Division, he began to notice a change in the claimant's personality;

b. Claimant appeared to become uptight, agitated and nervous after his transfer and change of duties;

c. He noticed a gradual change in claimant and it seemed as if he began to become depressed.

9. The claimant called the claimant's wife, Gerry Clowes, who testified as follows:

. . . .

b. She recognized a gradual change in the claimant after his transfer to the Night Felony—Homicide Division which included his refusal to attend social events, reluctance to go to work and periods of depression;

c. She noticed the deterioration between 1981 and 1985 at which time she convinced claimant to see Dr. Gerald Massaro, the City of Pittsburgh Police Psychologist;

. . . .

10. Following Claimant's release from the Butler Memorial Hospital he came under the care of Dr. Chester M. Berschling. . . .

Dr. Berschling diagnosed claimant as suffering from a post-traumatic stress disorder as a result of the change of duties from the Vice Division to the Night Felony—Homicide Division.

Dr. Berschling testified that in his opinion the claimant's transfer to the Night Felony—Homicide Division was the sole factor which caused his mental injury.

Dr. Berschling testified as follows:

a. The claimant's mental disability of post-traumatic stress disorder was caused as a result of his transfer from the Vice Division to the Night Felony—Homicide Division, and the change in duties and responsibilities attendant thereto;

b. He further testified that the claimant suffered no mental disability or injury prior to his transfer and change of duties;

c. He testified that the claimant is suffering from severe depression and had been totally disabled since the last date of his employment and is totally disabled at the present time;

d. Claimant began to develop a mental illness upon assuming the duties of the Night Felony—Homicide Division, a position which carried greater responsibilities and represented a substantial change in duties;

e. The claimant's mental illness occurred over a period of time from 1981 through 1985 in an objectively discernible manner;

At the present time, claimant is suffering from anxiety, agitation, and a feeling of being out of control;

f. Claimant's illness was a slow evolving process and claimant would not be suffering from this mental illness if he had not been transferred...;

g. Claimant cannot sleep and is constantly hounded by nightmares; Claimant was placed on high dosages of drugs in an effort to quite [sic] his condition;

h. Claimant suffers outbursts of crying and has become a recluse staying at home ...;

i. It was the progressive accumulation of traumatic experiences while in the Night Felony—Homicide Division which caused claimant's mental disability.

*This Referee finds the testimony of Dr. Berschling believable.*

. . . .

18. Your referee upon consideration of all the evidence presented plus the lay and medical witness testimony finds that there is insufficient evidence to prove claimant was subjected to abnormal working conditions for a compensable injury.

This referee fnds (sic) that claimant's evidence [shows a] subjective reaction to normal working conditions as a police officer and not objective evidence of a psychiatric injury or abnormal work situation. This referee finds that the claimant failed to prove the existence of actual and not perceived or imagined work events that caused a [sic] injury. (Emphasis added.)

The referee denied Clowes' claim, concluding that Clowes' illness was a subjective reaction to normal working conditions and was, therefore, not compensable under *Martin v. Ketchum, Inc.,* 523 Pa. 509, 568 A.2d 159 (1990).[3] Clowes appealed to the Board, which affirmed the referee based upon the testimony of Dr. Stuart Burstein, the City's expert, who offered the opinion that Clowes' mental problems were not work related. This appeal followed.

Clowes contends that (1) the referee erred in denying his claim, since the record contains objective evidence of abnormal working conditions, (2) the referee's denial of compensation

3. Furthermore, the referee set forth the following conclusion of law, "There is no unequivocal medical testimony relating [Clowes'] work-related activities to his mental illness." (Referee's decision and order, conclusion of law # 4.) We must note, however, that Dr. Berschling stated without equivocation that the activities at work were the cause of Clowes' disabling condition. The City incorrectly argues that this testimony was equivocal because Dr. Berschling testified that he *thought* the transfer to homicide caused the mental illness. We have specifically held that an expert's testimony that he or she *thinks* or *believes* that a fact exists does not render that testimony equivocal. *Philadelphia College of Osteopathic Medicine v. Workmen's Compensation Appeal Board (Lucas),* 77 Pa.Commonwealth Ct. 202, 465 A.2d 132 (1983).

violates The Pennsylvania Workmen's Compensation Act (Act),[4] which requires that psychiatric injuries arising in the course of employment be compensated, and (3) the Board erred when it disregarded the referee's findings and affirmed the referee based on medical evidence introduced by the City.

Although psychic injuries are compensable under Section 301(c) of the Act, 77 P.S. § 411, an employee's subjective reaction to being at work and being exposed to normal working conditions will not establish a compensable psychic injury. *Thomas v. Workmen's Compensation Appeal Board,* 55 Pa.Commonwealth Ct. 449, 423 A.2d 784 (1980). Instead, a claimant has the burden of proving by objective evidence that he or she has suffered a psychic injury and that the injury is other than a subjective reaction to normal working conditions. *Martin.* No one disputes that Clowes is in fact disabled because of a psychiatric injury; rather, the dispute concerns whether this disabling injury is compensable because of exposure to abnormal working conditions. When there is no physical injury as a precursor to an alleged psychic injury, the following test is applied to determine whether the alleged psychic injury is compensable: the claimant must demonstrate either (a) that actual, extraordinary events that can be pinpointed in time occurred at work which caused the psychic injury or (b) that abnormal working conditions over a longer period of time caused the psychic injury. *Cadden v. Workmen's Compensation Appeal Board (City of Philadelphia),* 135 Pa.Commonwealth Ct. 195, 579 A.2d 1378 (1990), *petition for allowance of appeal denied,* 527 Pa. 652, 593 A.2d 424 (1991).

In *Martin,* our Supreme Court defined the term "abnormal working conditions" as the means by which a "court [should] distinguish between objective and subjective evidence of the working conditions alleged to have caused the injury...." *Id.* 523 Pa. at 518, 568 A.2d at 164. Our Supreme Court explained:

4. Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1031.

The [abnormal working conditions rule] ... was intended to distinguish psychiatric injuries that are compensable because the necessary causal relationship between the employment and mental disability has been established from those psychiatric injuries that arise from the employee's subjective reactions to normal working conditions. The phraseology 'abnormal working conditions' has developed into a shorthand expression for that critical distinction.

*Martin,* 523 Pa. at 518–19, 568 A.2d at 164.  In light of *Martin,* this Court has stated:

Whether the working conditions are or are not abnormal is a question which relates to the cause of the injury.  Case law in Pennsylvania makes clear that while abnormal working conditions may be sufficient to link the injury to the employment, subjective reactions to normal working conditions will not.  *Martin.*  The apparent rationale for this rule is that while some circumstances by their nature may cause psychic injury, others would not work such an injury on a healthy psyche unless there were other elements at play. Accordingly, we have directed our attention to distinguishing between what actually took place at the work place and what was a subjective reaction to those real events.  Only when we are satisfied that the actual events could cause a psychic injury, have we held that benefits were proper.

*Calabris v. Workmen's Compensation Appeal Board (American General Companies),* 141 Pa.Commonwealth Ct. 405, 413, 595 A.2d 765, 769 (1991).

■ Psychic injury cases are highly fact sensitive.  *Blecker v. Workmen's Compensation Appeal Board (Pennsylvania Human Relations Commission),* 141 Pa.Commonwealth Ct. 317, 595 A.2d 729 (1991).  The question of whether a claimant experienced abnormal working conditions is a mixed question of law and fact.  *Id.*  We may, therefore, judge the correctness of a referee's decision as to the existence of abnormal working conditions and draw our own conclusions from the facts as part of our appellate review.  *City of Scranton v. Workmen's Compensation Appeal Board (Hart),* 136 Pa.Com-

monwealth Ct. 483, 583 A.2d 852 (1990), *petition for allowance of appeal denied,* 528 Pa. 625, 597 A.2d 1154 (1991).

■ Clowes contends that the referee erred in not granting him benefits, because there is objective evidence of abnormal working conditions in the record. The referee specifically believed the expert testimony of Dr. Berschling, who testified that Clowes suffered from a mental illness that was caused by his transfer from the vice division to the homicide division of the City's police department. The referee also determined that Clowes' illness progressed over time in an objectively discernible manner. Even though the referee found that Clowes had a mental illness caused by his employment, the referee denied benefits on the ground that Clowes' illness developed as a subjective reaction to the normal working conditions of a police officer. Our inquiry, therefore, must focus on whether the referee correctly determined that Clowes' psychic injury was caused by normal working conditions.

Clowes makes two arguments that he experienced abnormal working conditions: (1) the record shows that he experienced an increase in responsibilities and a change in duties, when he was transferred into the homicide division of the City's police department; and (2) he experienced unusual events which were outside the normal working conditions of a homicide detective. Because we conclude that Clowes was not subjected to abnormal working conditions, we must affirm the Board's order denying him benefits.

We believe that one overriding fact must be considered when analyzing this case; i.e., Clowes was a policeman for over twenty three years while in the City's employ. As Judge Doyle aptly stated in a concurring and dissenting opinion in *Bell Telephone Company of Pennsylvania v. Workmen's Compensation Appeal Board (DeMay)*, 87 Pa.Commonwealth Ct. 558, 569, 487 A.2d 1053, 1058 (1985), "Many types of jobs are, by their very nature, high stress. Such occupations as that of ... a police officer, for example, may well be viewed as high

stress; but for these particular positions, *high stress is normal.*" (Emphasis in original.) Judge Doyle went on to state:

It is my view that for a high stress working environment to constitute a legally sufficient abnormal working condition there must be a finding either that claimant's work performance (as distinguished from a mere job description) was unusually stressful *for that kind of job* or a finding that an unusual event occurred making the job more stressful than it had been.

*Id.* at 570, 487 A.2d at 1059 (emphasis in original). We must note that while this language originally appeared in an opinion representing the view of only one of our colleagues, we have since quoted it in majority opinions of the court, thereby adopting it and giving it precedential value. *City of Scranton v. Workmen's Compensation Appeal Board (Hart),* 136 Pa.Commonwealth Ct. 483, 489–90, 583 A.2d 852, 855–56 (1990); *Squilla v. Workmen's Compensation Appeal Board (Marple Township),* 146 Pa.Commonwealth Ct. 23, 31, 606 A.2d 539, 543 (1992).

We believe *City of Scranton* is instructive. In that case, we affirmed the award of benefits for a mental injury suffered by a policeman. The City of Scranton argued, as does the City in the present case, that the injured employee did not encounter abnormal working conditions. After quoting the language of Judge Doyle from *DeMay* mentioned above, we first noted that the job of a police officer was one that *normally involved a high degree of stress.* Without going into a description of all of the facts involved in *City of Scranton,*[5] a review of the facts in that case will show that the officer was given a *dramatic increase in work that he was required to perform.* As we stated:

When Scranton faced the epidemic of murders, the stressful responsibilities increased drastically. Hart was given new responsibilities, such as traveling out of town for trials and to have scientific tests performed on crucial physical evidence. He was also required to present evidence to

5. *See* 136 Pa.Commonwealth Ct. at 492–95, 583 A.2d at 857–58.

grand juries. Even with all the added responsibilities due to the serial killings, Hart was required to perform his regular duties with respect to all of the other crimes commonly committed in Scranton.

Not only did Hart's responsibilities increase, but the intensity of the stress associated with his duties also increased. Hart felt tremendous pressure from the community to solve those crimes, and arrest the murderers. This pressure was compounded by the fact that some of the victims were prominent citizens. Moreover, since Hart personally knew three of the murder victims and was especially close to one of the families, the intensity of the pressure on him to solve these crimes was overwhelming. His trips to out-of-town trials and to analyze evidence were also extremely stressful, since he had so much work to be done back at the Department and he hated to be away from his family. . . .

The circumstances in the present case in which an increase in Hart's responsibilities was compounded by an increase in the intensity level of the stress associated with his responsibilities, clearly support the Referee's finding that 'abnormal working conditions' exist due to the fact that his work performance was *unusually* stressful.

*Id.* at 495, 583 A.2d at 858 (emphasis added) (citation omitted). For the following reasons, we believe that the present case is distinguishable from *City of Scranton.*

Most importantly, in the present case, Clowes did not produce any evidence of a *substantial increase* in his job duties and responsibilities. While those duties and responsibilities may have *changed* when he was transferred from vice to homicide, there is no evidence, as there was in *City of Scranton,* that the transfer made greater demands on Clowes' time and energy. Furthermore, the evidence in *City of Scranton* showed that the officer there was faced with a wave of unsolved murders, another fact not present in Clowes' case. Clowes argues that he, just like the officer in *City of Scranton,* faced added pressures because he knew some of the victims of the homicides that he was investigating. Without denigrating

the traumatic effect such incidents can have on one's psyche, we must note that encountering dead bodies is a *normal condition* for homicide policemen. This similarity with *City of Scranton* is not, in our view, sufficient, given the other obvious differences between the two cases, to require a finding and conclusion that Clowes had encountered abnormal working conditions based upon the holding in *City of Scranton.*

We believe that one additional point must be made with regard to Clowes' claim that the transfer into the homicide division constituted abnormal working conditions. Three of Clowes' witnesses testified that the transfer from vice to night felonies in 1981 affected Clowes' personality. Detective O'Leary testified that Clowes appeared to become uptight, agitated and nervous following Clowes' change in duties in 1981. Gerry Clowes testified that her husband refused to attend social events at times after the 1981 transfer; she also testified that she noticed a gradual deterioration in Clowes' mental condition between 1981 and 1985. Finally Dr. Berschling also stated that Clowes' mental illness began to surface in an objectively discernible manner between 1981 and 1985. All of this evidence belies Clowes' claim that the 1985 transfer into the homicide division was the abnormal working condition which precipitated his mental disability.

Clowes argues that he encountered an "unusually stressful event"; i.e., in 1987 he discovered the body of Patrick O'Connor, who had been his close friend. We have stated that proof of an "extraordinary" event constitutes objective evidence to prove that working conditions were abnormal. *Cadden.* Even if the discovery of O'Connor's body was an "extraordinary" event, that discovery occurred in 1987. As mentioned in the previous paragraph, Clowes' evidence showed that his mental condition began to deteriorate as early as 1981. Clowes was transferred to homicide in 1985. An event which occurred in 1987, no matter how extraordinary, simply cannot prove that events occurring between two and six years earlier were abnormal working conditions.

Clowes relies upon other cases, all of which we believe are distinguishable. For example, we affirmed the award of bene-

fits for a mental injury in *Leo v. Workmen's Compensation Appeal Board (Borough of Charleroi)*, 114 Pa.Commonwealth Ct. 6, 537 A.2d 399 (1988). In *Leo*, however, the employee was transferred from the Street Department to the Police Department. In the present case, although Clowes was reassigned to homicide, he still remained a police officer and faced no such drastic change in his duties and responsibilities.

In *Pollard v. Workmen's Compensation Appeal Board (North Strabane Township)*, 131 Pa.Commonwealth Ct. 339, 570 A.2d 143 (1990), the police officer was promoted from his position as an officer to the job of officer-in-charge. The promotion involved a significant increase in job responsibilities. The referee found that the promotion forced the officer to encounter abnormal working conditions and awarded benefits. The Board affirmed, but on reconsideration reversed, concluding that the officer's claim petition was barred by the statute of limitations. We reversed and reinstated the award of benefits, concluding that the statute of limitations had not run. *Pollard*, however, offers no support for Clowes' position for two reasons. First, the officer in *Pollard* encountered a significant increase in responsibilities. Even more importantly, however, we specifically stated:

> We note that *we do not have before us in this case any question as to the validity of the psychic injury, and, therefore, express no opinion thereon.* See, as to the area of psychic injuries where there is no precipitating physical trauma, the recent Supreme Court opinions in *Martin v. Ketchum, Inc.*, 523 Pa. 509, 568 A.2d 159 (1990).

*Pollard*, 131 Pa.Commonwealth Ct. at 343 n. 3, 570 A.2d at 145 n. 3 (emphasis added). *Pollard* simply did not answer the question of whether the officer there was exposed to abnormal working conditions; rather, the only question decided was that statute of limitations had not expired. Thus, *Pollard* is essentially of no value on the question of what constitutes abnormal working conditions.

Finally, in *Bevilacqua v. Workmen's Compensation Appeal Board (J. Bevilacqua Sons, Inc.)*, 82 Pa.Commonwealth Ct. 511, 475 A.2d 959 (1984), we concluded that abnormal working

conditions were present when an employee left his job as a sheet metal worker with no supervisory responsibilities and took over his retired father's position which *added* a number of such responsibilities to the employee's duties. As we have already noted, Clowes has failed to offer any evidence concerning *additional* responsibilities given to him when he was transferred to homicide. Because we can distinguish all of the cases relied upon by Clowes as support for his argument that he faced abnormal working conditions, we are compelled to conclude that Clowes failed to prove his injury was caused by abnormal working conditions, a necessary element of his proof in this case. *Martin.*

Clowes next argues that the denial of benefits in this case violates the Act. We believe that his argument in this regard is essentially that psychic injuries should be treated no differently than physical injuries and that the distinction between normal and abnormal working conditions be ignored. In *Martin,* however, the Supreme Court specifically rejected this argument.

■ Finally, Clowes argues that the Board erred when it based its decision denying benefits on the testimony of the City's expert, Dr. Stuart S. Burstein. We agree that the Board's reliance upon Dr. Burstein's testimony was error, as the referee never credited that testimony while specifically stating that he believed the testimony of Clowes' medical expert to the contrary. The error of the Board, however, does not require reversal. It is well settled that we may affirm the Board's order even if the Board employed erroneous reasoning as long as the correct reason for affirming is apparent from the record. *Gregorious v. Workmen's Compensation Appeal Board (European Health Spas, Inc.),* 87 Pa.Commonwealth Ct. 86, 486 A.2d 564 (1985). Because the record here shows that Clowes failed to prove that he was faced with abnormal working conditions, the Board's error in its reasoning is harmless at best.

Accordingly, the order of the Board is affirmed.

PELLEGRINI, J., did not participate in the decision in this case.

## ORDER

AND NOW, this 21st day of March, 1994, the February 14, 1992 order of the Workmen's Compensation Appeal Board at No. A91–1403 is affirmed.

COLINS, Judge, dissents.

PELLEGRINI, J., did not participate in the decision in this case.

COLINS, Judge, dissenting.

I must dissent from the scholarly opinion of the majority in this extremely troubling and difficult matter.

As noted by the majority, Dr. Berschling, whom the referee found credible, testified that the "claimant suffered no mental disability or injury prior to his transfer and change of duties" and, further, in Finding of Fact No. 10(i), "it was the progressive accumulation of traumatic experiences while in the night felony homicide division which caused claimant's mental disability." The referee then continued to state his legal opinion that there was insufficient evidence to prove claimant was subjected to abnormal working conditions for a compensable injury.

It is from this legal conclusion, affirmed by the majority, that I differ. The majority has correctly noted that "when a fact finder specifically states that a witness is credible, we must assume that *all of the testimony of that witness* is accepted as true."

In reviewing the entirety of his credible testimony, we find that Dr. Berschling stated that, in his professional opinion, the increase in responsibilities and the change of duties connected to Clowes' transfer from the vice division to the homicide division were the sole cause of Clowes' mental illness. According to Dr. Berschling, Clowes experienced a progressive accumulation of traumatic experiences in the course of his

duties as a homicide detective, and, as a result, Clowes developed post-traumatic stress disorder and severe depression. Dr. Berschling also opined that Clowes did not suffer from a mental illness prior to his transfer, and, had the transfer not occurred, he would not have developed the aforementioned mental conditions.[1]

Dr. Berschling also discussed specific work-related events which impacted on Clowes' mental health, emphasizing Clowes' investigations into the deaths of two individuals that he knew. Dr. Berschling testified as follows:

Q. Did you determine that there was any significance in his employment history as it related to the condition which you found him in.

A. During the course of his time on homicide ... he progressively deteriorated, and he described for me several emotionally laden situations which he ... felt finally pushed him over the edge.

Q. What were they.

. . . .

A. He described for me ... at least five instances which were very, very troublesome to him. One was a shooting incident of an adolescent that had stolen a car, to discover that it was a policeman's son. Another was the death of a judge's daughter. A very difficult one for Mr. Clowes was the Pittsburgh Regatta accident in the summer of '88 and going to the hospital to see the kids, and a trailer truck accident ... where a truck had apparently lost its brakes and just careened into some elderly gentlemen who just happened to be sitting there playing cards.

The thing that Mr. Clowes describes in—a lot of the qualitative feeling that he describes in these things are, one, he

1. The City incorrectly argues that Dr. Berschling's testimony was equivocal, because he testified that he *thought* Clowes' transfer to the homicide division caused his mental illness. An expert's testimony is not rendered equivocal if the expert testifies that he or she believes or thinks that the facts exist. *Philadelphia College of Osteopathic Medicine v. Workmen's Compensation Appeal Board (Lucas)*, 77 Pa.Commonwealth Ct. 202, 465 A.2d 132 (1983). Therefore, we must conclude that Dr. Berschling's testimony was unequivocal.

knew some of the people. For instance, the partner's son. I think he had seen him 24 hours earlier and talked with him. He apparently had some familiarity or knowledge or friendliness with the judge's daughter. . . .

Deposition of Cheater Berschling, M.D., pp. 15–17.

In his testimony, Clowes described, *inter alia,* his discovery of the body of Patrick O'Connor, a person whom he had known for seven years, at the scene of an auto accident. He had been with that individual the day before the accident, and he was the first officer to view the body. Clowes' testimony was augmented by the testimony of Detective O'Leary. Detective O'Leary testified that in his 25 years of police work, he had never known a police officer who was the first person to view the corpse of an individual with whom the police officer had a personal relationship. He also testified that Clowes saw Patrick O'Connor approximately three or four days per week and that he was like a son to Clowes. Detective O'Leary described the effect of that death on Clowes as follows:

Q. [D]id you form an opinion that his change of duties was part of the problem, if not the problem, his change of duties into doing homicide work.

A. I think it was, and that coupled with seeing Patrick that night, he just snapped. . . . [T]hat guy changed from the guy I knew for years to the guy that came into homicide, and then after Patrick, that wasn't the same guy, that was like being in a room with a completely different person.

Deposition of Terrance P. O'Leary at 25.

This Court has held that a change of duties accompanied by an increase of responsibility can establish abnormal working conditions. *Berardelli v. Workmen's Compensation Appeal Board (Bureau of Personnel State Workmen's Insurance Fund),* 134 Pa.Commonwealth Ct. 450, 578 A.2d 1016 (1990), *petition for allowance of appeal denied,* 527 Pa. 625, 592 A.2d 46 (1991); *Leo v. Workmen's Compensation Appeal Board (Borough of Charleroi),* 114 Pa.Commonwealth Ct. 6, 537 A.2d 399 (1988). While Clowes held the position of police officer before and after his transfer, the record demonstrates that Clowes' job responsibilities increased and his duties changed

substantially after he was transferred from the vice division to the homicide division. In our view, there is a vast qualitative difference between Clowes' duties as a vice officer where he investigated only non-violent offenses and his duties as a homicide detective where he investigated only murders and fatal accidents.[2]

Moreover, it is clear from the testimony of Detective O'Leary that it is very rare for a police officer to discover the corpse of a person he or she had known. Clowes' discovery of the body of Patrick O'Connor was pinpointed by Detective O'Leary as causing a sudden change in Clowes' mental condition. In *City of Scranton*, this Court determined that because a police officer personally knew three murder victims whose deaths he was investigating, the amount of stress the officer experienced on the job was increased, and this increase of stress contributed to the existence of abnormal working condition. Similarly, Clowes' discovery of the bodies of two persons whom he knew constituted unusual events that made his job more stressful than it had been.

I cannot agree with the majority's conclusions that this case is distinguishable from *City of Scranton*. The instant matter contains objective evidence showing that Clowes, after his transfer to the homicide division of the City's police department, developed a mental illness caused by his employment. The record is replete with objective evidence, found credible by the referee, showing a progressive deterioration of his mental health, caused solely by the increase in responsibility

2. We note that the instant case is distinguishable from our decision in *Supinski v. Workmen's Compensation Appeal Board (School District of Philadelphia)*, 133 Pa.Commonwealth Ct. 631, 577 A.2d 944 (1990). In *Supinski*, a special education teacher alleged that she sustained a psychic injury when she was transferred from a position where she taught retarded students to a position where she taught learning disabled children. We held that, while Supinski was transferred to a different classroom, she was not subjected to abnormal working conditions, since her job responsibilities remained essentially the same, and because she possessed a professional certification in special education. In the present case, however, it is clear from the record that Clowes' job responsibilities increased, and his job duties changed after his transfer from the vice division to the homicide division. Thus, *Supinski* does not control the outcome of the case.

and the change in his job duties resulting from his transfer from the vice division to the homicide division of the City's police department. The record further contains objective evidence, found credible by the referee, showing that Clowes experienced unusual events on the job that had a severe impact on his mental condition and made his job more stressful than it normally would have been. Hence, we should conclude that, because of objective evidence connecting Clowes' mental illness to his employment, Clowes demonstrated that he suffered a psychic injury caused by abnormal working condition.

In *Hershey Chocolate Co. v. Workmen's Compensation Appeal Board (Lasher)*, 162 Pa.Commonwealth Ct. 23, 638 A.2d 336 (1994), we noted that under the Act, claimants with bona fide psychiatric injuries are treated differently from claimants with bona fide physical injuries. Because of this dual standard, Clowes' burden of proving that he sustained a psychic injury was much higher than it would have been if he sustained a physical injury.[3] However, the referee's credibility determinations clearly establish that Clowes met this burden, and, therefore, benefits should be awarded.

---

**3.** See *Hershey Chocolate Co.*, 162 Pa.Commonwealth Ct. 23, 34 n. 2, 638 A.2d 336, 342 n. 2.