### CITY OF PITTSBURGH

v.

### Patrick LOGAN.

**Appeal of City of Pittsburgh/Frank Gates Services Company.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs May 19, 2000.
Decided July 19, 2001.

Dale A. Cable, Pittsburg, for appellant.

Bryan Campbell, Pittsburgh, for appellee.

Before DOYLE, President Judge, FRIEDMAN, Judge and MIRARCHI, Jr., Senior Judge.

DOYLE, President Judge.

The City of Pittsburgh (City or Employer) appeals from an order of the Court of Common Pleas of Allegheny County that affirmed an arbitrator's decision granting Patrick Logan's claim petition for benefits pursuant to what is frequently referred to as the Heart and Lung Act.[1] Due to the evolution of case law on this subject, the essential issue presented is whether there are **ever** any working conditions that can be considered abnormal for a police officer, given the highly stressful nature of a police officer's daily work life; we believe that there may be, and that this is such a case.

On October 21, 1998, Logan, a City police officer, filed a claim petition for benefits under the Heart and Lung Act, alleging that he suffered from work-related "[a]nxiety attacks—post-traumatic stress disorder—severe" and that the "[c]umulative effect of police shooting resulted in psychological disability. Primarily threats of harm to family." (Reproduced Record (R.R.) at 2a.) Logan sought full disability benefits beginning October 9, 1998 as well as the payment of his medical bills. (R.R. at 3a.)

Arbitration hearings were held on January 11, 1999, February 3, 1999, and February 19, 1999, at which time only Logan presented witnesses, although both parties offered exhibits to support their respective positions. By an opinion dated July 7, 1999, the arbitrator found:

> Claimant in the course of his duties has been in seven shootouts, has been stabbed three times, has had fractures of his skull, face, right arm, and wrist, and in early 1998 had been assaulted four separate times. In November 1993 he was involved in a shootout with an assailant who shot at his face from point blank range. Claimant and other officers on the scene returned fire killing the assailant. The assailant's family and/or gang placed a $50,000.00 bounty on Claimant for his death, and Claimant was then transferred to a different unit.

(Arbitrator's Decision, p. 3; R.R. at 226a.)

The arbitrator evaluated the reports of various doctors and mental health experts, including Harlan B. Handler, M.D., Clarissa Cabacungan, M.D., and Russell H. Scott, Ph.D., who treated Logan, and who believed him to have suffered a work-related psychic injury. The arbitrator also considered the report of an independent psychiatric examiner, Stuart S. Burstein, M.D., who believed that Logan had no mental disability. After considering all of the evidence, the arbitrator found:

> In the instant case the credible and consistent testimony of Claimant and his witnesses, particularly Lieutenant [Phillip] Dacey who distinguished Claimant's experiences from normal typical experiences is persuasive of the requisite abnormal working conditions. The reports of treating Drs. Cabacungan, Handler, and Scott suffice to establish causation

---

1. Act of June 28, 1935, P.L. 477, as amended, 53 P.S. §§ 637–38.

and disability, and are credited over the report of the examiner, Dr. Burstein. (Arbitrator's Decision, p. 9; R.R. at 232a.) The arbitrator concluded as a matter of law that "Claimant did prove a disabling post traumatic stress disorder and panic disorder **as the result of abnormal working conditions in the course of duty.**" (Arbitrator's decision, Conclusion of Law No. 5, p. 10; R.R. at 233a.)  (Emphasis added.)

On appeal, the Court of Common Pleas of Allegheny County affirmed the arbitrator's decision, explaining, *inter alia,* that "[t]he case of *City of Philadelphia v. Ryder,* 712 A.2d 350 (Pa.Cmwlth. [1998)] is controlling on the issue of what constitutes abnormal working conditions.  The facts presented by Officer Logan are more compelling than those in *Ryder.*" (Common Pleas decision, dated December 15, 1999, p. 2; R.R. at 256a.)[2]  However, we note that, while this Court in *Ryder* upheld an award of benefits for post-traumatic stress disorder suffered by police officer Howard Ryder as a result of a standoff that we determined to be an actual extraordinary event, this Court later stated in *Young v. Workers' Compensation Appeal Board (New Sewickley Police Department),* 737 A.2d 317 (Pa.Cmwlth.1999), that our Supreme Court's decision in *City of Philadelphia v. Workers' Compensation Appeal Board (Brasten),* 556 Pa. 400, 728 A.2d 938 (1999), had overruled *Ryder sub silentio.* Our analysis in *Young* has since been confirmed by the Supreme Court's very recent decision in *City of Philadelphia v. Civil Service Commission of the City of* *Philadelphia (Ryder),* 772 A.2d 962, 2001 Pa. LEXIS 1083 (May 21, 2001), in which the Supreme Court did indeed reverse our earlier *Ryder* decision.

▇▇  As a result of the decision in Common Pleas, Employer appealed to this Court, raising the issue of whether the arbitrator erred in deciding that Logan met his burden of proving a psychic injury where, the City contends, Logan failed to demonstrate abnormal working conditions in the performance of his job duties.[3]

▇▇  We begin our analysis by noting that, in Heart and Lung Act cases, just as in workers' compensation cases, "where a claimant suffers a psychological injury caused by psychological stimuli while in [the] performance of his or her duty, the claimant must prove that such injury is other than a subjective reaction to normal working conditions."  *Rodgers v. Pennsylvania State Police,* 759 A.2d 424, 429 (Pa. Cmwlth.2000), *petition for allowance of appeal denied,* 771 A.2d 1292 (Pa.2001). Regarding this issue, the law is now settled that both the Heart and Lung Act and the Workers' Compensation Act[4] require a claimant to establish abnormal working conditions in the absence of direct and immediate physical trauma as the causation for the claimant's mental disability.

Employer in the instant case contends that Logan has not sufficiently met his burden of proving abnormal working conditions, and, therefore, he cannot properly receive Heart and Lung benefits due to his psychic injury.  Specifically, Employer states in its brief that "[t]he basis of this

---

**2.** The *"Ryder"* case is more properly cited as *City of Philadelphia v. Civil Service Commission of Philadelphia,* 712 A.2d 350 (Pa. Cmwlth.1998), *petition for allowance of appeal granted in part,* 559 Pa. 383, 740 A.2d 1141 (1999).  *See* a further discussion of this case on page 873 of this opinion, *infra.*

**3.** By *per curiam* order dated March 12, 2001, this Court approved the parties' stipulation that " 'the reproduced record is the entire record which [shall] be considered by the Commonwealth Court of Pennsylvania.' "

**4.** Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1041.4; 2501–2626.

appeal is not whether the claimant established a causal relationship between his mental condition and his work environment, but whether such conditions rose to the level of an abnormal work condition." (Appellant's brief, p. 6, n. 2.) In essence, Employer contends that Logan's testimony of work-related mental stress, albeit caused by cumulative trauma, particularly trauma arising out of a shooting incident involving the police and one Maniea (a.k.a. Stoney) Bey, which eventually led to media attention and a bounty on Logan and his family, does not support a finding of abnormal working conditions. Employer cites a number of cases in an attempt to support its position.[5]

■ Of course, "[p]sychic injury cases are highly fact sensitive." *Clowes v.*

*Workmen's Compensation Appeal Board (City of Pittsburgh)*, 162 Pa.Cmwlth.583, 639 A.2d 944, 948 (1994), *petition for allowance of appeal denied*, 543 Pa. 697, 670 A.2d 144 (1995). The question of whether working conditions are abnormal is a mixed one of law and fact. *Id.* Consequently, we may adjudicate the correctness of the arbitrator's decision that Logan suffered from abnormal working conditions and derive our own conclusions from the facts as part of the appellate review process. *See id.*

In the matter *sub judice*, Logan testified not only to his long tenure as a police officer and to the difficulties inherent in his normally highly stressful job, but also to the significant trauma that he and his

---

**5.** These cases include *Rydzewski v. Workers' Compensation Appeal Board (City of Philadelphia)*, 767 A.2d 13 (Pa.Cmwlth.2001) (where benefits for a mental/mental injury were ultimately denied to the claimant, a City of Philadelphia police officer, who responded to a call to assist two other officers who were shot and seriously injured, as the claimant did not prove that his experience constituted an abnormal working condition for a person in his line of work); *Young* (where benefits for a mental/mental injury were ultimately denied to the claimant, a township police officer, because the stand-off event in which he was involved was not an abnormal working condition for a police officer); *Brasten* (where an evenly· divided Supreme Court affirmed this Court's decision that the claimant, a City of Philadelphia police sergeant, who shot and killed an unarmed suspect and then underwent a grand jury investigation, indictment, trial and media attention, had not proven abnormal working conditions such that he could recover for a mental/mental injury); and *Parson v. Workmen's Compensation Appeal Board (Springettsbury Township)*, 164 Pa. Cmwlth.165, 642 A.2d 579 (1994) (where benefits for a mental/mental injury were denied to the claimant, a township police officer, because an eight-hour incident involving him, other officers, and a barricaded gunman, did not rise to the level of an abnormal working condition). Employer also states that this

Court determined in *City of Scranton v. Workmen's Compensation Appeal Board (Hart)*, 136 Pa.Cmwlth.483, 583 A.2d 852 (1990), *petition for allowance of appeal denied*, 528 Pa. 625, 597 A.2d 1154 (1991), that "the stress placed on a police officer associated with an unusually intense investigation of a serial murder, even when one of the victims was a neighboring family friend, did not constitute an abnormal work condition." (Appellant's brief, p. 10.) In making this statement, Employer most assuredly relied on the following language in the opinion that, "It is quite clear that the work performance required of Hart was extremely difficult and stressful, but for his position, this type of stress was normal." *Hart*, 583 A.2d at 857. However, this Court eventually concluded that, because Hart was given new responsibilities in addition to his regular duties due to the startling increase in murders, and because his stress level increased due to community pressure to solve the crimes and to his numerous work-related out-of-town trips to attend trials and analyze evidence, Hart **did** suffer a psychic injury as a result of abnormal working conditions. *Id.* at 858. While we acknowledge that the final result in *Hart* was to uphold an award of fatal claim benefits to the detective's widow, we nevertheless question the continuing viability of *Hart* in light of the more recent decisions of our Court and the Supreme Court, recounted above.

family suffered after the Stoney Bey incident,[6] and to the **cumulative** effects of that incident on him, when considered in light of several unrelated but nevertheless violent episodes occurring thereafter. In this regard, Logan testified that he was hired to be a City police officer on February 10, 1969, when he was twenty-one years old (N.T., 2/3/99, p. 5; R.R. at 70a), and that, in the more than thirty years that he had been a police officer, he had been involved in seven police-related shooting incidents, including one in which he shot the suspect, but not before his partner was severely beaten. (N.T., 2/3/99, pp. 5, 9–10; R.R. at 70a, 74a–75a.)

Logan also testified that the last shooting in which he was involved happened in November 1993, when "[s]ome drug officers or uniformed officers were making a stop of a guy up in East Liberty, and the actor's name was Maniea Bey. And he took off running. He got to Penn Avenue, and he started shooting at the police, officers returning fire." (N.T., 2/3/99, p. 11; R.R. at 76a.) Logan's testimony then continues:

I proceeded to go to try and apprehend him. I looked around the—I looked around the back end of the truck that he was hiding behind. He stuck a gun to the middle of my forehead from like this when I looked around the car. He told me to "die mother f* * * * *."

And I turned my head quickly like this, and the gun went off. He fired the gun, and it went off exactly, well, not exactly, let's say, between four to six inches from my face.

I pushed myself up against the car, and I pointed my gun around the car. I wasn't looking where he was at. I just put my gun around the car. And I kept firing my gun until it jammed, and when it jammed I just collapsed at the scene.

Later I was to find out that 13 of the 17 rounds that he was hit with were from my gun.

(N.T., 2/3/99, pp. 11–12; R.R. at 76a–77a.) [7]

Logan testified that, afterwards, there were countless newspaper articles on the incident, and he was called a killer and a murderer. (N.T., 2/3/99, p. 13; R.R. at 78a.) There was also a "constant barrage from the news media" and marches (N.T., 2/3/99, p. 14; R.R. at 79a) and a two-day inquest. (N.T., 2/3/99, p. 15; R.R. at 80a.) Logan stated that, some time after the shooting was officially determined to be justified, he was transferred to the warrant office for his own safety and, of the eight officers involved in the Bey incident, only he was transferred. (N.T., 2/3/99, pp. 17–18; R.R. at 82a–83a.) Logan further testified that, after the Bey shooting, he became aware of potential threats against him and his family through Lieutenant Phillip Dacey. Logan stated in this regard: "He called me in his office and he says, I have something to tell you. He says, We have an informant, and the informant has advised us that a $50,000 bounty has been placed on you and your family's head by members of the C.R.I.P. gang." (N.T., 2/3/99, p. 21; R.R. at 86a.)

Logan explained that his wife "became terrified[,]" that she went to see a psychologist, Dr. Russell Scott, for approximately six months because of "night terrors and

---

6. According to Logan's testimony, Bey "had been in the gang activity for years. He was part of the hierarchy of the C.R.I.P. gang." (Notes of Testimony (N.T.), Testimony of Patrick Logan dated February 3, 1999, p. 69; R.R. at 134a.)

7. Even so, it appears from the record that, while Logan fired most of the bullets that hit Stoney Bey, a bullet from another officer's gun struck him in the heart. (N.T., dated February 19, 1999, Testimony of Lieutenant Phillip Dacey, p. 12; R.R. at 148a.)

nightmares[,]" and that he would have to sit up at night so that she could sleep. (N.T., 2/3/99, pp. 21–22; R.R. at 86a–87a.) He also testified that, as a result of the Bey incident, three gang members cornered one of his sons at school and told him they intended to kill him before the day's end. (N.T., 2/3/99, p. 23; R.R. at 88a.) According to Logan:

> From that time on, my son ate in the cafeteria with the security, he stopped participating in a lot of class activities. The three gang members were transferred out of the school to other locations.
>
> I had to take my son to and from school every day until the time he graduated. In his final years as a senior, he stopped playing football because they started on him again about the shooting, about the stuff. So he stopped almost all the activities he had as a child because of the shooting.

*Id.*

Logan proceeded to testify that, during the year 1998, he began to have some problems and went to see Dr. Gerald Massaro, the city psychologist, after he received his fourth beating in less than six months. (N.T., 2/3/99, p. 24; R.R. at 89a.) According to Logan, these beatings occurred between late November 1997 and May 1998, and they included being beaten by an armed rape suspect while his fellow officers were not near enough to come to his aid (N.T., 2/3/99, p. 32; R.R. at 97a), wrestling with an HIV-infected prostitute who scratched, spat and tried to bite the officers (N.T., 2/3/99, p. 33; R.R. at 98a), and attempting to arrest a man who "knee drop[ped]" on his testicles, causing them to swell larger than lemons. (N.T., 2/3/99, pp. 34–35; R.R. at 99a–100a.) After this incident, Logan went to the hospital and "was x-rayed for a concussion and injuries to [his] groin and chest[,]" and was off of work for two weeks. (N.T., 2/3/99, p. 35; R.R. at 100a.) When he returned to work, his testicles were still swollen. Although Logan testified that Dr. Massaro was too busy to take his case (N.T., 2/3/99, p. 24; R.R. at 89a), he further explained that, once again, he was having the same type of problems that he had after the Bey incident. *Id.* Logan testified:

> A week after the shooting I had nightmares, insomnia, not sleeping, getting three hours of sleep a day, sometimes four hours of sleep a day, wake up in the middle of the night crying for no apparent reason, outbursts of anger at my wife for something stupid, just start screaming.
>
> The nightmares were the worst because they came three and four a week at times. After the last beating, they were, like, every night. That's when I went to see Dr. Massaro.

(N.T., 2/3/99, pp. 24–25; R.R. at 89a–90a.)

Logan also stated that, when he was due to be in court on September 9, 1998, he:

> started having things that had happened years ago come back in my head, just play like a videotape in front of me.
>
> . . .
>
> Shooting incidents that I've had over the years, the fact that at one time I had carried a baby out of a house that a father had shot in the head and took to the hospital and couldn't save, just a lot of gory stuff that happened that just started coming back like a flood. Then I thought I was going to die.

(N.T., 2/3/99, p. 27; R.R. at 92a.)

Although the life of a police officer is fraught by great stress, we nevertheless hold that, based on all of the credited testimony, claimant's work performance (as distinguished from a mere job description) was unusually stressful for that kind of job, **and** an unusual event occurred

making the job more stressful that it had been. *Clowes,* 639 A.2d at 948 (quoting *Bell Telephone Company of Pennsylvania v. Workmen's Compensation Appeal Board (DeMay),* 87 Pa.Cmwlth. 558, 487 A.2d 1053, 1059 (1985) (Doyle, J., concurring and dissenting)).

■ Here, the arbitrator credited in particular the testimony of Logan's lieutenant, Phillip Dacey, who testified, *inter alia,* that the threat to Logan was "the most serious threat I have ever received on an officer" (N.T., dated January 11, 1999, Testimony of Phillip Dacey, p. 12; R.R. at 18a.); that, even when threats were made, it was not common practice to transfer an officer from one unit to another (N.T., 2/19, 1999, p. 5; R.R. at 141a), and that, in the course of his professional career, he had never heard of another instance where a bounty or a contract was placed on an officer. (N.T., 2/19/99, pp. 13–14; R.R. at 149a–150a.) Clearly, Dacey's testimony is sufficient to support "a finding that an unusual event occurred making the job more stressful than it had been." *Clowes,* 639 A.2d at 948 (quoting *DeMay,* 487 A.2d at 1059 (Doyle, J., concurring and dissenting)). In other words, in this specific instance, Logan proved that the type of threat placed on his life and the lives of his family, taken together with all of the other events that occurred in this case, amounted to an abnormal working condition, even for a police officer.

Unlike *Brasten,* where representatives of the Philadelphia Police Department testified that the events and shooting incident which occurred on June 26, 1992 were **normal** working conditions for a Philadelphia police sergeant (Sergeant Brasten), here, by contrast, Lieutenant Dacey credibly testified that what happened to Logan was anything but normal.[8] Moreover, further distinguished from the facts in *Brasten,* Officer Logan and his family were subjected to serious death threats by the criminal element in our society, and we consider these threats a "working condition" essentially and directly connected to the shooting incident of Stoney Bey in November of 1993.

■ In summary, it is our opinion that Officer Logan is entitled to benefits for a mental/mental injury where he proved **not only** that he suffered an unusual work event that resulted in a mental disability, but also that the **cumulative** effects of that unusual event were compounded by other factors, most notably, four violent episodes occurring in no more than a six-month period.[9] These factors were, of course, directly related to his duties as a police officer, and, all of them, most re-

8. In *Young,* we explained the Supreme Court's reasoning in *Brasten* by stating:

Although Justices Nigro, Castille and Newman would hold that the events *following* the police action were abnormal working conditions, they joined Justices Zappala and Cappy and Chief Justice Flaherty in finding that the extremely stressful police action *preceding* the indictment of the police officer which resulted in the death of an individual was *not* an abnormal working condition for a police officer. Therefore, what we can distill from *Brasten* is that all six Justices agreed that the shooting incident itself was *not* an abnormal working condition for a police officer, and the logi-

cal conclusion of that distillation is that, if the events in *Brasten* were not abnormal working conditions, then the facts and events in this present appeal also cannot be an abnormal working condition in the view of our Supreme Court.
*Young,* 737 A.2d at 321–322. (Emphasis added and in original.)

9. Because Logan, with respect to these four beatings, described actual events rather than subjective feelings, his testimony alone is sufficient to establish abnormal working conditions. *Archer v. Workmen's Compensation Appeal Board (General Motors),* 138 Pa.Cmwlth. 309, 587 A.2d 901, 907 (1991).

markably, the death threats, rose to the level of abnormal working conditions, even for a police officer.

██ Accordingly, the order of the Allegheny County Common Pleas Court is affirmed, albeit on different grounds.[10]

### ORDER

**NOW,** July 19, 2001, the order of the Court of Common Pleas of Allegheny County in the above-captioned matter is hereby affirmed.

FRIEDMAN, Judge, dissenting.

I respectfully dissent. Rather than affirm the trial court's award of heart and lung benefits to police officer Patrick Logan (Claimant), I would vacate and remand.[1] In affirming, the majority concludes that Claimant sustained a psychic injury in 1998 as a result of abnormal working conditions, i.e., the "cumulative effects" of a shooting incident in November 1993, compounded by "four violent episodes" between November 1997 and May 1998. (Majority op. at 877–878.) Based on existing case law, I cannot agree that these incidents constitute abnormal working conditions.[2]

My view of this case is that Claimant sustained a psychic injury in 1993 as a result of incidents that Pennsylvania courts consider normal working conditions. Claimant received counseling and never became disabled from work. This pre-existing work-related psychic injury, a result of normal working conditions, recurred in May 1998 when Claimant was beaten severely in the course of performing his normal work duties. When Claimant sought counseling through the city's "critical incident stress debriefment" program, it was not available. (R.R. at 128a.) This lack of counseling, which I consider an abnormal working condition, aggravated Claimant's pre-existing psychic condition and caused Claimant to become disabled.[3] Thus, I believe that Claimant may be entitled to benefits in this case. However, the arbitrator failed to consider whether the evidence indicates that lack of counseling after May 1998 caused Claimant's disability in September 1998; therefore, I would vacate and remand.

"To recover workers' compensation benefits for a psychic injury, a claimant must prove by objective evidence that he has suffered a psychic injury and that such injury is other than a subjective reaction to normal working conditions." *Davis v. Workers' Compensation Appeal Board (Swarthmore Borough)*, 561 Pa. 462, 473, 751 A.2d 168, 174 (2000) (citing *Martin v. Ketchum, Inc.*, 523 Pa. 509, 568 A.2d 159 (1990)). "Even if a claimant shows actual,

---

10. We may affirm on different grounds where grounds for an affirmance exist. *Belitskus v. Hamlin Township*, 764 A.2d 669, 671, n. 4 (Pa.Cmwlth.2000).

1. The majority affirms the trial court's decision on other grounds because the trial court based its decision solely on *City of Philadelphia v. Civil Service Commission*, 712 A.2d 350 (Pa.Cmwlth.1998), which was reversed by our supreme court on May 21, 2001.

2. Claimant has experienced a number of extraordinary, but normal, events during his thirty-year career as a police officer. Although I am sympathetic to the fact that

Claimant has performed his duties with courage and distinction, existing case law does not indicate that a certain number of *normal* events occurring within a certain period of time may constitute *abnormal* working conditions.

3. To ignore that the existence of psychological intervention is critical to the mental health of police officers, whose job duties are normally more dangerous than most, if not all, other workers, would be to ignore the legislative imperative to provide benefits for mental/mental and mental/physical disabilities.

not merely perceived or imagined, employment events that have precipitated psychic injury, the claimant must still prove the events to be abnormal in order to recover." *Id.* "[F]or actual work conditions to be considered abnormal, they must be considered in the context of the specific employment." *Id.* at 479, 751 A.2d at 177 (quoting *Wilson v. Workmen's Compensation Appeal Board (Aluminum Company of America)*, 542 Pa. 614, 669 A.2d 338 (1996)). Those experiences that "may be anticipated in the course of the officer's duties" do *not* constitute abnormal working conditions. *City of Philadelphia v. Civil Service Commission*, 565 Pa. 265, ——, 772 A.2d 962, 969 (2001)

## I. Claimant's Working Conditions

### A. 1989–1993

Here, the record indicates that Claimant worked as a patrolman in "a bad zone [Zone 5], probably the hottest zone in the city." [4] (R.R. at 70a, 82a, 151a.) Claimant testified that, in 1989, his partner, Carol Duffy, wearing a bulletproof vest, was almost beaten to death by a burglary suspect before Claimant was able to stop the beating by shooting the suspect. (R.R. at 74a.) In 1991, Claimant and his partner, Jimmy McGee, were involved in "numerous incidents where [they] were shot at" by gang members; in one year, from 1991 to 1992, Claimant and his partner recovered 109 guns from gang members. (R.R. at 75a.) Thus, Claimant could anticipate

that his duties might involve injury from beatings and shootings.

In 1993, Claimant shot gang member Stoney Bey after the gang member nearly shot and killed Claimant at pointblank range. [5] (R.R. at 76a–77a.) This turned out to be a high profile case, with media coverage, negative publicity, public demonstrations and a coroner's inquest. An informant notified the police that a $50,000 bounty had been placed on Claimant, and, for Claimant's protection, the police transferred him to another unit. [6] In addition, Claimant's son received a death threat at school. However, none of these "effects" of the incident constitutes an abnormal working condition under Pennsylvania case law.

#### 1. Publicity, Demonstrations, Inquest

In *City of Philadelphia v. Workers' Compensation Appeal Board (Brasten)*, 556 Pa. 400, 728 A.2d 938 (1999), an evenly divided supreme court affirmed this court's holding that indictments, investigations, media attention and public demonstrations arising out of a police officer's shooting of a suspect do *not* constitute abnormal working conditions. [7] Thus, here, these effects of the Stoney Bey incident do not rise to the level of abnormal working conditions.

#### 2. Death Threats

In *Davis*, a police officer with a thirty-one year career claimed that he sustained a psychic injury in 1991 as a result of repeated stressful and life-threatening ex-

---

4. Claimant worked the "paddy wagon" in the Homewood–Brushton area. (R.R. at 78a.)

5. Ironically, if the bullet that Stoney Bey fired at pointblank range had struck Claimant's head, Claimant or his family would have been entitled to benefits. However, although Claimant saw the bullet coming, he is not entitled to benefits for a psychic injury resulting from fear of what could have been, i.e., his death.

6. Claimant did not want to be transferred from Zone 5; he wanted "to go out and to work my [paddy] wagon that I worked for the last 20 years." (R.R. at 78a–79a, 83a.)

7. Three justices would have reversed this court's decision in *Brasten*, holding that multiple indictments and prosecutions constitute abnormal working conditions. *See Brasten.* However, this case does not involve multiple indictments and prosecutions.

periences. The officer described several of his experiences, including one in 1974 where he arrested a member of the Pagan motorcycle gang for attempted murder. The officer testified that, after the arrest, the police chief informed him that *unknown individuals had threatened to shoot him and his family* to prevent him from testifying at trial. Our supreme court held that the officer was *not* entitled to benefits, stating that there was "absolutely no evidence" that the officer's experiences were unusual for a law enforcement officer. *Id.* at 479, 751 A.2d at 177.

Here, a $50,000 bounty was placed on Claimant within a month of the Stoney Bey incident.[8] Lieutenant Phillip Dacey testified that there have been instances where someone has issued a direct, first-person death threat against a police officer; however, he never heard of anyone putting a bounty or a contract on an officer.[9] (R.R. at 142a, 149a–56a.) However, the test for determining if an officer's experience constitutes an abnormal working condition is whether the experience may be anticipated in the course of the officer's duties. *See City of Philadelphia.* The task is *not* to determine how many times the experience has occurred in the past.[10] Moreover, in *Davis*, unknown persons issued a death threat against a police officer, and our supreme court did not consider that to be evidence of an abnormal working condition.

In addition, Claimant's son was threatened at school. However, Claimant testified that the school provided security for his son and transferred the individuals who threatened him. (R.R. at 129a–30a.) Claimant also testified that he was satisfied with the school's response to the situation. (R.R. at 130a.) Moreover, in *Davis*, our supreme court did not consider a threat to an officer's family to be evidence of an abnormal working condition.

#### B. 1994—1995

After the Stoney Bey incident, Claimant sought counseling from Russell H. Scott, Ph.D. (R.R. at 84a.) Dr. Scott worked with Claimant and his family on the problem and, after a period of time, thought the matter "was resolved and over with." (R.R. at 192a–93a.)

The city transferred Claimant out of Zone 5 because of the $50,000 contract on his life. For two months, Claimant worked in the warrant office in the basement of the Public Safety Building. (R.R. at 83a.) As a patrolman, Claimant had been bald, completely shaved, with a small mustache. (R.R. at 126a.) However, while working in the warrant office, Claimant grew hair and a beard to give him a different appearance. When his hair and beard were long enough, Claimant was moved to the auto squad as an undercover detective, a non-uniform position out of the

---

**8.** I point out that the majority seems to accept Claimant's testimony that the $50,000 bounty was placed on Claimant and his family. (Majority op. at 875, 877–878.) However, the arbitrator found only that the bounty was placed on Claimant. (Arbitrator's op. at 3.) Moreover, Lieutenant Phillip Dacey, who informed Claimant about the threat, testified only that the bounty was placed on Claimant. (R.R. at 17a.)

**9.** In other words, Dacey testified that police officers usually receive a death threat from a

person who is known to them, and Claimant's threat is from unknown persons who would kill him for the bounty.

**10.** Suppose a police officer suffers a psychic injury due to an experience that has never happened to another officer. That officer could argue that it was an abnormal experience and receive benefits. However, the next ten officers who suffer a psychic injury due to the same experience will not receive benefits because they cannot argue it never happened before.

public eye. (R.R. at 83a–84a, 124a–25a.) Claimant testified, "They were looking for a bald policeman with a mustache, not a policeman with [long hair and a ponytail] and a [full] beard." (R.R. at 124a, 126a.) Claimant said that he "was pretty much hidden" by his hair. (R.R. at 124a.) Even so, Claimant stayed out of Zone 5; he testified that his partner "took care of that part." (R.R. at 125a.) Thus, Claimant did not present evidence of abnormal working conditions for the period from 1994 to 1995.

### C.  1996—May 1998

In 1996, there was a change in police administration, and Claimant was transferred to Zone 6. (R.R. at 84a.) In his new position, Claimant wore a uniform, drove a patrol car without a partner and took reports. (R.R. at 126a–27a.) Claimant shaved his beard and cut his ponytail, but he still had hair. (R.R. at 125a–26a.) Thus, Claimant's appearance in his new position still was different from his appearance in 1993.

In 1996 or 1997, the city instituted the "critical incident stress debriefment" program, known as C.I.S.D.[11] (R.R. at 128a.) Under this program, when an officer is having a problem due to a stressful work experience, the officer is to see Dr. Massa-

ro, the city psychologist.[12] "[T]hey call him the critical incident stress [person]." (R.R. at 90a.) In other words, the C.I.S.D. program provides counseling as a service to stabilize police officers who, in the course of their normal job duties, experience what otherwise would be considered abnormal, traumatic events.

Between November 1997 and May 1998, Claimant endured four beatings while assisting in the apprehension and arrest of various suspects. (R.R. at 97a–100a.) Claimant testified that, while attempting to apprehend an armed rape suspect, he was punched a couple of times on the side of the head and was kicked in the right thigh. (R.R. at 97a–98a.) Medics gave him oxygen and a towel, but he did not require treatment at a hospital. (R.R. at 133a.) In a second incident, Claimant wrestled with an HIV-positive prostitute who was fighting, scratching, spitting and trying to bite the arresting officers. (R.R. at 98a.) Claimant testified that it was the *third* HIV-positive incident Claimant had in two years. (R.R. at 98a.) As a result, medics gave Claimant "all this stuff to wipe myself down." (R.R. at 133a.) In the third incident, Claimant assisted plainclothes officers in a drug arrest that resulted in a fight.[13] (R.R. at 98a.) Claimant testified,

11. In 1969, the city started to use a psychological screening process, designed by Dr. Scott, to determine a person's mental suitability for the job. (R.R. at 190a, 200a.) Fifty percent of those who participate in the city's screening process are found to be mentally unfit to perform the job duties and are not hired. (R.R. at 190a.) In deciding to provide counseling for its police officers, the city recognized the humanness and fallibility of its officers and that even one of its top cops might succumb to the stress of the job absent some assistance.

Indeed, the city had found Claimant to be mentally fit when he joined the force in 1969, and, for many years, Claimant performed the duties of a police officer in an exemplary

manner. (R.R. at 190a.) CBS twice featured Claimant's work experiences on its television series "Top Cops." (R.R. at 72a–73a; 115a–16a.) The television series "Cops" also based four of its episodes on Claimant's experiences as a police officer. (R.R. at 75a, 114a–15a.) Despite his mental toughness, however, Claimant needed and benefited from counseling.

12. Dr. Massaro is "the person they tell us to go see if you're having a problem." (R.R. at 89a.)

13. I note that, although the majority concludes that this incident constitutes an abnormal working condition, the majority does not even describe it. (*See* Majority op. at 876.)

"Nothing to take off of work for, but enough to make a report on." (R.R. at 98a.) Finally, Claimant was attempting to arrest a man who punched Claimant in the head and injured Claimant's testicles. (R.R. at 99a.) Claimant was taken to the hospital for x-rays and was off work for two weeks. (R.R. at 100a.) He returned to light duty work, but, after three weeks, Claimant wanted to return to his regular job. (R.R. at 100a.)

The majority concludes that these four violent episodes rise to the level of abnormal working conditions. (Majority op. at 877–878.) However, Claimant's testimony is the only evidence in the record relating to the four events. A claimant's testimony regarding actual events is sufficient. to prove abnormal working conditions only where the events constitute abnormal working conditions as a matter of law. *See Archer v. Workmen's Compensation Appeal Board (General Motors)*, 138 Pa. Cmwlth. 309, 587 A.2d 901 (1991) (holding that the claimant's testimony regarding actual events of harassment is sufficient to prove abnormal working conditions because harassment is an abnormal working condition as a matter of law). Because violent episodes are *not* abnormal working conditions for police officers as a matter of law, Claimant's testimony, by itself, is insufficient to prove they constitute abnormal working conditions.

Even if we could rely solely on Claimant's testimony to decide whether the four events constituted abnormal working conditions, I point out that Claimant's medical treatment after the first three incidents consisted of (1) oxygen and a towel, (2) a "wipe down" and (3) nothing at all. Moreover, Claimant could anticipate exposure to HIV-positive persons in performing his job duties.[14] Furthermore, Claimant ultimately admitted that "getting lumped up pretty bad," as he did in those four episodes, is "something you could expect could happen to a police officer," just as it happened to his partner, Carol Duffy. (R.R. at 131a.) Thus, unlike the majority, I cannot conclude that these four events constitute abnormal working conditions for a police officer.

**D. June 1998—September 9, 1998**

After the beating in May 1998, Claimant started to have nightmares every night and insomnia, the same symptoms Claimant experienced after the Stoney Bey incident in 1993. (R.R. at 89a–90a.) Claimant went to see Dr. Massaro, the "critical incident stress person," but the city's psychologist could not handle any more cases.[15] (R.R. at 89a.)

A few months later, on September 8, 1998, Claimant began to feel ill while at work, and the lieutenant allowed him to go home early. (R.R. at 90a–91a.) The next morning, Claimant felt light-headed and apprehensive, but he had to go to court to testify in connection with a case. (R.R. at 91a.) When he arrived, he told one of the court secretaries that he did not feel well and that he would be sitting in the sergeant's office. (R.R. at 92a.) Claimant started to have flashbacks and was unable to get up and walk. (R.R. at 92a.) He was taken to the hospital for tests and has not worked since then. (R.R. at 93a, 96a.)

**II. Abnormal Working Condition**

The evidence in the record before us suggests that Claimant sustained a psychic injury in 1993 and had a recurrence of this

---

14. In fact, there had been two previous HIV-positive incidents.

15. Dr. Massaro was counseling fifty officers for stress depression and could not handle any more cases. (Arbitrator's op. at 3; R.R. at 89a.)

injury in May 1998. However, counseling, which had helped Claimant in the past [16] and which was supposed to be available through the C.I.S.D. program, was *not* available. It appears that, eventually, the lack of counseling caused Claimant to suffer a *disabling* psychic injury.

I believe that, where an employer provides psychological counseling as medical intervention to specifically address the nature of a job, and does so in the customary course of conduct in the operation of its business, the unavailability of such counseling constitutes an abnormal working condition. Indeed, the employee anticipates that, when he or she needs psychological assistance as a result of the performance of his or her normal job duties, counseling will be available. Here, the city's failure to provide counseling to Claimant following a severe beating is such a deviation from the practice and procedures adopted by the city as to constitute an abnormal working condition. Claimant sought counseling after the May 1998 beating, anticipating that it would be available, but it was unavailable.

### III. Causation

In *Brasten*, an evenly divided supreme court set forth two theories of causation in determining whether indictments, investigations, media attention and public demonstrations following a police shootout constitute abnormal working conditions. Justice Zappala's "Opinion in Support of Affirmance" [17] states:

The rationale for requiring a showing of abnormal working conditions is to establish the *causal connection* between a psychic injury and the employment. *The focus must be on the stimulus underlying the claimant's reaction.*

In the present case, the investigation and trial were the stimulus for [the claimant's] injury. This was the testimony of [the claimant's] own medical expert and the finding of fact by the WCJ. Being indicted in a homicide case is certainly traumatic, but I would hold that *even if the events occurring after the shooting were abnormal, they were, at best, tangentially related to [the claimant's] employment.*

*Brasten*, 556 Pa. at 404, 728 A.2d at 940 (emphasis added). Thus, "neither the negative publicity nor the arrest and trial were working conditions." *Id.* at 405, 728 A.2d at 941.

Justice Nigro's "Opinion in Support of Reversal" [18] states that, although an investigation is a normal and foreseeable consequence of the officer's duties under the circumstances here, multiple indictments and prosecutions are not.

Furthermore, I cannot subscribe to the assertion that the foregoing events [the indictments and prosecutions] are merely "tangentially" related to [the claimant's] employment as, *but for* his employment as a police officer and his participation in the "normal" events of June 1992, he would not have been a defendant in the subsequent indict-

---

**16.** Dr. Scott "helped [Claimant] through many incidents which were of an acute nature." (R.R. at 193a, 200a.) After the Stoney Bey incident in 1993, Dr. Scott counseled Claimant and, despite the negative publicity, the public demonstrations, the coroner's inquest, the bounty and the threat to his son, Claimant never missed work due to a psychological disability.

**17.** Chief Justice Flaherty and Justice Cappy joined in this opinion.

**18.** Justice Castille and Justice Newman joined in this opinion.

ments nor the object of media attention.

*Id.* at 408, 728 A.2d at 942 (emphasis added). In other words, Justice Nigro would find a causal connection between a psychic injury and a claimant's employment where: (1) an actual extraordinary event, a shooting pinpointed in time, caused a normal event, an investigation; (2) this normal event caused abnormal events, multiple indictments and prosecutions; and (3) these abnormal events were the stimulus for the psychic injury. *Id.*

Whereas Justice Zappala's analysis requires a direct and immediate relationship between an abnormal work experience and the resulting psychic injury, Justice Nigro's analysis requires only that a relationship lie somewhere in the chain of causation. Justice Zappala sets forth a "proximate cause" theory of causation [19] that does not recognize causation where an abnormal event is to any extent remote from the employment itself.[20] Thus, causation in fact, or "but for" causation, is not part of the analysis. To permit it would result in causation being attributed to events that are not truly working conditions. Justice Nigro sets forth a "causation in fact" theory that recognizes causation as long as the abnormal event occurs *somewhere* in the chain of causation from the normal work incident to the disabling psychic injury. It does not matter how remote the abnormal event is in place or time from the work incident because "but for" the work incident, there would have been no subsequent abnormal event and no subsequent psychic injury. Where this causal connection exists, the employment is the cause of the injury.

Applying Justice Zappala's theory of causation here, the events that occurred after the Stoney Bey incident in 1993 were not working conditions at all. At best, they were tangentially related to Claimant's employment. The negative publicity, the public demonstrations, the coroner's inquest and the death threats simply were too remote from the actual shooting to be the proximate cause of Claimant's psychic injury. The May 1998 beating was the proximate cause of the recurrence of Claimant's pre-existing work-related psychic injury, but the beating was a normal working condition. The lack of counseling after May 1998, an abnormal working con-

---

19. To recover damages for negligence under the common law, the negligent conduct must be the legal or proximate cause of the plaintiff's injuries. RESTATEMENT (SECOND) OF TORTS § 430 (1965). An actor's negligent conduct is the legal cause of harm to another if the conduct is a substantial factor in bringing about the harm. RESTATEMENT (SECOND) OF TORTS § 431(a) (1965). Whether an actor's conduct is a substantial factor in causing an injury is a question for the jury when reasonable minds may differ in that regard. *Vattimo v. Lower Bucks Hospital, Inc.*, 502 Pa. 241, 465 A.2d 1231 (1983); RESTATEMENT (SECOND) OF TORTS § 434(2) (1965). If it appears to the court "highly extraordinary" that the actor's conduct should have brought about the harm, the conduct may be held *not* to be a legal cause of the harm. RESTATEMENT (SECOND) OF TORTS § 435(2) (1965). However, "if the actor should have realized that his conduct might cause harm to another in substantially the manner in which it is brought about, the harm is universally regarded as the legal consequence of the actor's negligence." RESTATEMENT (SECOND) OF TORTS § 435 cmt. b (1965).

20. The chain of causation in a negligence case represents the many causes in fact of an injury. *Bell v. Irace*, 422 Pa.Super. 298, 619 A.2d 365 (1993). "Cause in fact or 'but for' causation provides that if the harmful result would not have come about but for the negligent conduct then there is a direct causal connection between the negligence and the injury." *First v. Zem Zem Temple*, 454 Pa.Super. 548, 686 A.2d 18, 21 n. 2 (1996) (quoting *E.J. Stewart, Inc. v. Aitken Products, Inc.*, 607 F.Supp. 883, 889 (E.D.Pa.1985)), *appeal denied*, 549 Pa. 701, 700 A.2d 441 (1997).

dition, may have been the proximate cause of Claimant's disabling psychic injury because it aggravated Claimant's pre-existing psychic injury. However, there was no finding in this regard.

Applying Justice Nigro's theory of causation, the events that followed the Stoney Bey incident in 1993 caused Claimant's psychic injury because, but for that incident, those events would not have occurred. The May 1998 beating was a cause in fact of the recurrence of Claimant's psychic injury. The Stoney Bey incident also would be a cause in fact of the recurrence because, but for the Stoney Bey incident, there would not have been a pre-existing psychic injury or a recurrence of it. However, everything in the chain of causation from 1993 to May 1998 is a normal working condition. The lack of counseling after May 1998, an abnormal working condition, may have been a cause in fact of the aggravation of Claimant's pre-existing psychic injury. However, there was no finding in this regard.

As indicated above, one could reasonably infer from the evidence in this case that the absence of counseling after the May 1998 beating was the cause in fact *and* the proximate cause of the aggravation of Claimant's pre-existing psychic injury in September 1998. However, because the arbitrator relied on this court's decision in *City of Philadelphia*, which is no longer the law, the arbitrator never considered the unavailability of counseling as a possible cause of Claimant's injury or an abnormal working condition.[21] Accordingly, I would vacate and remand.

---

**21.** The arbitrator stated that the reports of psychiatrists Harlan B. Handler, M.D., Clarissa Cabacungan, M.D., and Dr. Scott suffice to establish causation and disability. (Arbitrator's op. at 9.) However, the arbitrator did not state a specific cause of Claimant's psychic injury.